1    ROBBINS GELLER RUDMAN
       & DOWD LLP
2    SHAWN A. WILLIAMS (213113)
   One Montgomery Street, Suite 1800
3    San Francisco, CA  94104
   Telephone:  415/288-4545
4    415/288-4534 (fax)
   shawnw@rgrdlaw.com
5         – and –
   DARREN J. ROBBINS (168593)
6    TRAVIS E. DOWNS III (148274)
   BENNY C. GOODMAN III (211302)
7    655 West Broadway, Suite 1900
   San Diego, CA  92101
8    Telephone:  619/231-1058
   619/231-7423 (fax)
9    darrenr@rgrdlaw.com
   travisd@rgrdlaw.com
10   bennyg@rgrdlaw.com

11   Attorneys for Plaintiff

12   [Additional counsel appear on signature page.]

13                  UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                    SAN JOSE DIVISION

| | |
|---|---|
| 16   CITY OF PONTIAC POLICE AND FIRE RETIREMENT SYSTEM, Derivatively on Behalf of ADVANCED MICRO DEVICES, INC.,      ) ) ) ) ) | Case No. |
| 17 | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF |
| 18            Plaintiff,    ) ) ) | FIDUCIARY DUTY, UNJUST ENRICHMENT AND VIOLATION OF THE |
| 19      vs.      ) ) | FEDERAL SECURITIES LAWS |
| 20   JOHN E. CALDWELL, NORA M. DENZEL, MARK DURCAN, MICHAEL P. GREGOIRE, JOSEPH A. HOUSEHOLDER, JOHN W. MARREN, ABHI Y. TALWALKAR and LISA T. SU,   ) ) ) ) ) ) ) | |
| 24       Defendants,    ) ) | |
|       – and –    ) ) | |
| 25   ADVANCED MICRO DEVICES, INC., a Delaware corporation,   ) ) ) | |
| 27       Nominal Defendant.    ) ) | |
|                       ) | DEMAND FOR JURY TRIAL |

28

**OVERVIEW**

1.      This is shareholder derivative action on behalf of nominal defendant Advanced Micro Devices, Inc. ("AMD" or the "Company") against its Board of Directors ("Board") and Chief Executive Officer ("CEO") for breach of fiduciary duty, unjust enrichment and violation of the federal securities laws.  Defendants are John E. Caldwell, Nora M. Denzel, Mark Durcan, Michael P. Gregoire, Joseph A. Householder, John W. Marren, Abhi Y. Talwalkar and Lisa T. Su (together, "Defendants").

2.      For the past several years, Defendants have publicly misrepresented AMD as a company that effectively promotes diversity throughout its ranks, including in the boardroom.  But, in 2020, there are still no African Americans on AMD's Board.  Likewise, no African American holds a senior executive position at the Company.  Although each of the Defendants was aware of this reality,[1] Defendants repeatedly represented that AMD "is committed to increasing the number of women and under-represented minorities in the technology industry" and "will actively identify candidates who could enhance the diversity represented on the Board." *Corporate Responsibility at AMD*; *Message from our President and CEO*, AMD, https://www.amd.com/en/corporate-responsibility/cr-amd; Charter of the Nominating and Corporate Governance Committee at 2-3.

3.      The business case for diversity is strong.  In 2015, McKinsey & Company ("McKinsey") first reported a statistically significant relationship between a more diverse leadership team and better financial performance, finding that "[c]ompanies in the top quartile of racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median," while "[c]ompanies in the bottom quartile for both gender and ethnicity/race were statistically less likely to achieve above-average financial returns than the average companies in the dataset (that is, they were not just not leading, they were lagging)."  Vivian Hunt, Dennis Layton & Sara Prince, *Diversity Matters*, McKinsey & Company, at 1 (Feb. 2, 2015) ("*Diversity Matters*"),

---

[1]      "Since 2018, we review annually our Diversity, Belonging, and Inclusion strategies and metrics with members of the AMD Board of Directors."  *People; Global Inclusion*, AMD, https://www.amd.com/en/corporate-responsibility/people.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                   - 1 -

1   https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/

2   why%20diversity%20matters/diversity%20matters.pdf.

3       4.    AMD has been damaged and irreparably harmed by Defendants' conscious,

4   continuing failure to embrace racial diversity throughout AMD's corporate enterprise, as has been

5   represented to shareholders.  By this action, Plaintiff seeks to remedy Defendants' dereliction of

6   their legal duty to act in the best interests of AMD and remove the institutional structures preventing

7   the Company from fulfilling its stated diversity objectives.

8   **INTRODUCTION**

9       5.    At almost every opportunity, AMD publicly asserts its commitment to "increasing the

10   number of women and under-represented minorities in the technology industry," which the Company

11   acknowledges is key to fostering a team that is "more creative, more productive, better at problem-

12   solving, and ultimately more profitable." *Corporate Responsibility at AMD; Message from our*

13   *President and CEO*, AMD, https://www.amd.com/en/corporate-responsibility/cr-amd (last visited

14   Sept. 28, 2020); AMD, *Corporate Responsibility Website Download*, at 31 (updated June 2020)

15   ("2020 CR Report"), amd.com/system/files/documents/2020-cr-download.pdf.   For example,

16   Defendants caused AMD to represent:

17
18
19   - "Building a diverse talent pipeline, encouraging a culture of respect and belonging, and increasing inclusion of under-represented groups, makes AMD stronger." *People; Global Inclusion*, AMD, https://www.amd.com/en/corporate-responsibility/people (last visited Sept. 28, 2020).

20
21   - "AMD is growing a diverse, inclusive workforce that embraces different perspectives and experiences to foster innovation, challenge the status quo when needed, and drive business performance." *Id.*

22
23   - "We are constantly striving to improve our gender and diversity numbers through specific programs, as is the case across the technology sector." *Id.*

24
25
26
27   - "Aligned with the company's commitment to diversity and inclusion and in light of recent events that highlight the work still ahead to end racism and social injustice, AMD announced its first steps to cultivate change with donations to high-impact non-profits focused on social and racial equality and support for their empowerment, scholarship and mentorship programs." AMD, Press Release, *AMD Commemorates 25 Years of Corporate Responsibility Reporting*, July 30, 2020.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- • "Since 2018, we review annually our Diversity, Belonging, and Inclusion strategies and metrics with members of the AMD Board of Directors." *People; Global Inclusion*, AMD, https://www.amd.com/en/corporate-responsibility/people (last visited Sept. 28, 2020).

6.    Corporate platitudes do not equate to satisfying AMD's public commitment to diversity.  To the contrary, AMD has lacked and continues to lack diversity at the top and is one of the few remaining publicly traded companies without a single male or female African American director.  The following are the current members of the Board:



7.    Most of Corporate America has made gains in the effort to obtain the benefits of racial diversity, including at the executive level.  Not AMD.  In 2020, there is not a single Black person on its 17-person executive leadership team:





8.      Their public statements aside, Defendants have not promoted racial diversity on AMD's Board and/or executive leadership team.  Rather than address these deficiencies head-on – by adding African Americans to the Board and the executive leadership team – Defendants have opted to have the Company issue platitudes.  AMD's public-facing communications state that the Company has various policies and programs underway to promote diversity, inclusion and belonging at AMD.  However, Defendants have failed to carry out the Company's policies and proclamations about increasing racial diversity at AMD.

9.      As a result, AMD was recently exposed for being among the 20 largest companies in the United States without a single black person on its Board.  *See Here Are the Largest Companies in America with Zero Black People on Their Boards*, Black Enterprise (Sept. 8, 2017), https://www.blackenterprise.com/companies-without-black-directors.  That was three years ago.

1   That exposure did not result in any changes to AMD's Board makeup, at least not with respect to the

2   addition of any African Americans.  More recently, in June 2020, AMD's Board was exposed yet

3   again for continuing to lack a single African American director.  *See* Kerri Anne Renzulli, *The 20*

4   *Largest Public U.S. Companies Without a Black Person On Their Board*, Newsweek (June 17,

5   2020),   https://www.newsweek.com/20-largest-public-us-companies-without-black-person-their-

6   board-1511319.

7          10.     A dearth of qualified African American candidates cannot be the answer to

8   Defendants' failure to live up to the Company's professed commitment to "actively identify

9   candidates who could enhance the diversity represented on the Board."  Charter of the Nominating

10  and Corporate Governance Committee at 2-3; *see also* Sara Ashley O'Brien, *He's served on 14*

11  *boards.  Now he wants companies to find other Black candidates*, CNN Business (July 24, 2020),

12  https://www.cnn.com/2020/07/24/tech/barry-lawson-williams-black-board-

13  representation/index.html.  As 2020 has unfolded, several companies previously without any African

14  American directors have nominated black persons to their boards of directors.  *See* Jessica Guynn &

15  Brett Schrotenboer, *Why are there still so few Black executives in America?*, USAToday (Aug. 20,

16  2020),     https://www.usatoday.com/in-depth/money/business/2020/08/20/racism-black-america-

17  corporate-america-facebook-apple-netflix-nike-diversity/5557003002/ ("Since July 30, two other

18  companies that didn't have any Black board members or top executives listed on their proxy

19  statements announced they were adding Black board members.  Bristol Myers Squibb said it was

20  expanding its board from 12 to 14 to add new board members Paula Price and Derica Rice, both of

21  whom are Black.  Procter & Gamble announced last week the appointment of new board member

22  Debra Lee, the former CEO of BET Networks.").

23         11.     In May 2020, a McKinsey report concluded that "[t]he business case for inclusion and

24  diversity (I&D) is stronger than ever," finding that "companies in the top quartile outperformed

25  those in the fourth by 36 percent in terms of profitability in 2019."  Vivian Hunt, Sara Prince,

26  Sundiatu Dixon-Fyle & Kevin Dolan, *Diversity wins:  How inclusion matters*, McKinsey &

27  Company, at 3-4 (May 19, 2020) ("*Diversity wins*"), https://www.mckinsey.com/featured-

28  insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters. McKinsey also found that,

1    "[f]or diverse companies, the likelihood of outperforming industry peers on profitability has

2    increased over time, while the penalties are getting steeper for those lacking diversity."  *Id.* at 3.

3         12.    AMD's directors owe fiduciary duties to the Company and its shareholders, including

4    the duty to be truthful and honest and to act consistent with AMD's public representations about the

5    Company's policies and procedures.  Defendants have failed on both counts.  In 2020, the AMD

6    Board still has no African Americans.  Nor is any member of the Company's executive leadership

7    team an African American man or women.

8         13.    The failure of the AMD Board to act consistent with AMD's public representations

9    concerning diversity has adversely impacted the Company.  Instead of actually embracing diversity,

10   Defendants have instead misled AMD shareholders and the public by making false assertions about

11   the Company's commitment to diversity and acted inconsistent with their obligation to increase

12   shareholder returns, which research confirms is attained through more diverse leadership teams.  In

13   doing so, Defendants have committed actionable breaches of fiduciary duty.

14        14.    One irrefutable truth is that actions speak louder than words.  Defendants' actions –

15   declining to nominate a single black person to the AMD Board – belie the veracity of their vocal,

16   widespread public statements in support of diversity, including in the Company's boardroom.  This

17   is, in part, why a pre-suit demand is excused.

18        15.    Discussions of race and assertions of racism can chill discussions about these issues

19   for several reasons.  Discussions about false statements involving race, or potential racism, have a no

20   less chilling effect.   This chilling effect can be even more acute in a homogenous corporate

21   boardroom among colleagues of professional distinction, even evoking a "there but for the grace of

22   God go I" empathy among the directors.

23        16.    In this context, a director implicated in making alleged false statements about efforts

24   to achieve a racially diverse board is left in a quandary, particularly after publicly affirming that

25   ADM "will actively identify candidates who could enhance the diversity represented on the Board,"

26   as is alleged here.  Charter of the Nominating and Corporate Governance Committee at 2-3.  The

27   cultural, legal and sociological risk calculus is dramatic.  None of these risks are easily reconciled by

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 6 -

1   a director enveloped in them without exposure to potential injury, measured not just in money, but in

2   social and reputational capital as well.

3       17.     A person of reasonable capacity and skill is not disinterested or otherwise detached

4   from the outcome of such an inquiry.  The stakes are too high; the risk of "cancellation" to a director

5   for actual or perceived hostility towards people of color is all too real.[2]

6       18.     A decision by a director to act upon a pre-suit demand commences a potentially

7   stigmatizing inquiry into a director, one that could expose the falsity of the director's publicly

8   statement concerning diversity or highlight unfair treatment of African American director

9   candidates.  A decision to reject a pre-suit demand could result in equally dire consequences.  At one

10  end of the spectrum, the public could view the director's previous statements supporting diversity as

11  disingenuous and, therefore, false.  Or worse yet, that director could be perceived by the public as

12  hostile to African Americans, and could be socially shunned.  Hence, a pre-suit demand on the AMD

13  Board is excused as futile.

14      19.     A pre-suit demand is also excused because Defendants voluntarily chose to make, and

15  caused the Company to make, false positive statements about diversity and their effort to achieve a

16  diverse board of directors.  Concurrently however, Defendants declined to nominate a single African

17  American woman and/or man to the AMD Board.  Defendants' actions belie their public statements

18  about creating a diverse Board.  Dishonesty is a breach of a Delaware director's fiduciary duty to act

19  in the best interests of the corporation and its shareholders.  As such, a pre-suit demand on the AMD

20  Board is futile.

21

22

---

[2]     *See, e.g.*, Jemima McEvoy, *Every CEO and Leader That Stepped Down Since Black Lives Matter Protests Began*, Forbes (July 1, 2020), https://www.forbes.com/sites/jemimamcevoy/2020/07/01/every-ceo-and-leader-that-stepped-down-since-black-lives-matter-protests-began/#52e880555593; Andrew J. Hawkins, *Uber senior executive resigns after racial discrimination allegations*, The Verge (July 11, 2018), https://www.theverge.com/2018/7/11/17561336/uber-senior-executive-resigns-racial-discrimination-allegations; Sarah Whitten and Yen Nee Lee, *Papa John's founder John Schnatter resigns as chairman after apologizing for N-word comment, shares surge*, CNBC.com (July 12, 2018), https://www.cnbc.com/2018/07/10/papa-johns-founder-john-schnatter-resigns-as-chairman-of-company-boar.html; Rachel Ranosa, *CEO fired over alleged racism against Uber driver*, Human Resources Director (Feb. 11, 2020), https://www.hcamag.com/us/news/general/ceo-fired-over-alleged-racism-against-uber-driver/213275.

**INTRADISTRICT ASSIGNMENT**

20.    A substantial part of the events and omissions which give rise to the claims in this action occurred in the County of Santa Clara, and as such this action is properly assigned to the San Jose division of this Court.

**JURISDICTION AND VENUE**

21.    This Court has jurisdiction under 28 U.S.C. §1331 because the claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78n(a)).  This Court has exclusive subject matter jurisdiction over the federal securities law claims under §27 of the Exchange Act (15 U.S.C. §78aa) and supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise lack.

22.    This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

23.    Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) AMD maintains its headquarters in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

24.    Plaintiff City of Pontiac Police and Fire Retirement System is and continuously has been a shareholder of AMD since July 2017.  Plaintiff will adequately and fairly represent the interests of AMD in enforcing and prosecuting these derivative claims.

25.    Nominal defendant Advanced Micro Devices, Inc. is a Delaware corporation with its executive offices located at 2485 Augustine Drive, Santa Clara, CA 95054.

1    26.    Defendant John E. Caldwell ("Caldwell") has served as a director of AMD since

2    2006.  He also has served on the Nominating and Corporate Governance and Audit and Finance

3    Committees of the AMD Board.  In 2019, Caldwell received at least $428,079 in fees and other

4    compensation while failing to act in the best interests of AMD and its shareholders.  Caldwell

5    publicly misrepresented AMD as a company that effectively promotes diversity throughout its ranks,

6    including in the boardroom, when, in fact, it does not.

7    27.    Defendant Nora M. Denzel ("Denzel") has served as a director of AMD since 2014.

8    She also has served on the Nominating and Corporate Governance and Compensation and

9    Leadership Resources Committees of the AMD Board.  In 2019, Denzel received at least $310,938

10   in fees and other compensation while failing to act in the best interests of AMD and its shareholders.

11   Denzel publicly misrepresented AMD as a company that effectively promotes diversity throughout

12   its ranks, including in the boardroom, when, in fact, it does not.

13   28.    Defendant Mark Durcan ("Durcan") has served as a director of AMD since 2017.  He

14   also has served on the Nominating and Corporate Governance and Compensation and Leadership

15   Resources Committees of the AMD Board.  In 2019, Durcan received at least $318,106 in fees and

16   other compensation while failing to act in the best interests of AMD and its shareholders.  Durcan

17   publicly misrepresented AMD as a company that effectively promotes diversity throughout its ranks,

18   including in the boardroom, when, in fact, it does not.

19   29.    Defendant Michael P. Gregoire ("Gregoire") has served as a director of AMD since

20   November 2019.  He also has served on the Nominating and Corporate Governance and Audit and

21   Finance Committees of the AMD Board.  In 2019, Gregoire received at least $202,365 in fees and

22   other compensation while failing to act in the best interests of AMD and its shareholders.  Gregoire

23   publicly misrepresented AMD as a company that effectively promotes diversity throughout its ranks,

24   including in the boardroom, when, in fact, it does not.

25   30.    Defendant Joseph A. Householder ("Householder") has served as a director of AMD

26   since 2014.  He also has served on the Nominating and Corporate Governance and Audit and

27   Finance Committees of the AMD Board.  In 2019, Householder received at least $313,710 in fees

28   and other compensation while failing to act in the best interests of AMD and its shareholders.

1   Householder publicly misrepresented AMD as a company that effectively promotes diversity

2   throughout its ranks, including in the boardroom, when, in fact, it does not.

3        31.   Defendant John W. Marren ("Marren") has served as a director of AMD since 2017.

4   He also has served on the Nominating and Corporate Governance and Audit and Finance

5   Committees of the AMD Board.  In 2019, Marren received at least $288,710 in fees and other

6   compensation while failing to act in the best interests of AMD and its shareholders.  Marren publicly

7   misrepresented AMD as a company that effectively promotes diversity throughout its ranks,

8   including in the boardroom, when, in fact, it does not.

9        32.   Defendant Abhi Y. Talwalkar ("Talwalkar") has served as a director of AMD since

10   2017.  He also has served on the Nominating and Corporate Governance and Compensation and

11   Leadership Resources Committees of the AMD Board.  In 2019, Talwalkar received at least

12   $301,292 in fees and other compensation while failing to act in the best interests of AMD and its

13   shareholders.  Talwalkar publicly misrepresented AMD as a company that effectively promotes

14   diversity throughout its ranks, including in the boardroom, when, in fact, it does not.

15        33.   Defendant Lisa T. Su ("Su") has served as a director of AMD since 2014.  She also

16   has served as AMD's CEO since 2014.  In 2019, Su received at least $58.5 million in salary, stock

17   awards, and other compensation while failing to act in the best interests of AMD and its

18   shareholders.  Su publicly misrepresented AMD as a company that effectively promotes diversity

19   throughout its ranks, including in the boardroom, when, in fact, it does not.

20        34.   By reason of their positions as AMD's directors and/or officers and because of their

21   ability to direct and control the Company's business and corporate affairs, Defendants owed AMD

22   and its shareholders a fiduciary duty to use their utmost ability to control and manage AMD in an

23   honest and lawful manner.  Toward that end, AMD's directors and officers owed the Company and

24   its shareholders fiduciary duties to exercise loyalty, good faith, and reasonable supervision over the

25   Company's management, policies, practices and internal controls.  Moreover, Defendants' fiduciary

26   duties required them to, among other things: (i) ensure that AMD complied with its legal obligations

27   and requirements, including legal compliance with the corporations and federal securities laws, as

28   well as acting only within the scope of legal authority and disseminating truthful and accurate

statements to AMD shareholders; (ii) conduct the affairs of the Company in an efficient, businesslike manner so as to lawfully maximize the value of the Company's shares; (iii) ensure that AMD was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules and regulations, including the corporations and securities laws; and (iv) refrain from breaching their fiduciary duties to AMD by adopting initiatives, policies, practices, procedures, and controls inconsistent with their fiduciary duties of care, loyalty and good faith.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.     In committing the wrongful acts complained of herein, Defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in the breach of their fiduciary duties.

36.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such action to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS' DUTY TO ACT IN THE BEST INTERESTS OF AMD AND ITS SHAREHOLDERS

37.     Corporations are one of society's most important institutions.  Without profitable corporations, capitalist economies contract, communities fail, and the general welfare suffers.  Diversity in the boardroom and throughout a corporate enterprise is a bulwark against these ills.

38.     Research confirms that firms with greater diversity enjoy greater profitability and create more shareholder wealth.  As such, building a high functioning, diverse board of directors lies within the very heart of a director's fiduciary duty to maximize corporate value to the fullest extent.  Declining to do so is not protected by the business judgment rule.

1    **Enhancing Shareholder Wealth Is a Director's Fundamental Duty**

2    39.    In early 2016, *The Economist* called shareholder primacy theory "the biggest idea in

3    business," stating "[t]oday shareholder value rules business." *Shareholder Value*, *Analyze this*, The

4    Economist (Apr. 2, 2016).  The idea is not new, however.  As early as 1919, the courts recognized

5    that "[a] business corporation is . . . carried on primarily for the profit of the stockholders." *Dodge v.*

6    *Ford Motor Co.*, 170 N.W. 668, 684 (Mich. 1919).  Over the years, this shareowner wealth

7    maximization norm has become the most fundamental concept in corporate law, and is firmly

8    embedded in "the law of the most important American jurisdiction – Delaware."  Leo E. Strine, Jr.,

9    *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability*

10   *Structure Established by the Delaware General Corporate Law*, Univ. of Penn., Inst. for Law &

11   Econ., Research Paper No. 15-08, at 3 (Mar. 11, 2015) ("Strine, *Dangers of Denial*").

12   40.    As Milton Freedman, legendary Chicago school economist, succinctly put it,

13   "corporations have no higher purpose than maximizing profits for their shareholders."  Milton

14   Friedman, *Capitalism and Freedom* (1962).  Specifically, he stated:

15   > In a free-enterprise, private-property system, a corporate executive is an
16   > employee of the owners of the business.  He has direct responsibility to his
17   > employers.  That responsibility is to conduct the business in accordance with their
     > desires, which generally will be to make as much money as possible while
     > conforming to their basic rules of the society, both those embodied in law and those
18   > embodied in ethical custom.

19   Milton Friedman, *The Social Responsibility of Business Is to Increase Its Profits*, N.Y. Times Mag.

20   at 1 (Sept. 13, 1970); *accord* John Armour, et al., *What Is Corporate Law?* in *The Anatomy of*

21   *Corporate Law: A Comparative and Functional Approach* 23 (3d ed. Oxford Univ. Press)

22   ("[S]hareholder primacy operates to 'assure that the corporation serves the best interests of its

23   shareholders or, more specifically, to maximize financial returns to shareholders or, more

     specifically still, to maximize the current market price of corporate shares.'").

24   41.    Delaware embraces shareholder primacy in its corporate law.  As former Delaware

25   Supreme Court Chief Justice Leo E. Strine, Jr. wrote:

26
27   > [A] clear-eyed look at the law of corporations in Delaware reveals that, within the
     > limits of their discretion, directors must make stockholder welfare their sole end, and
     > that other interests may be taken into consideration only as a means of promoting
28   > stockholder welfare.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 12 -

1   Strine, *Dangers of Denial* at 10; *accord Frederick Hsu Living Tr. v. ODN Holding Corp.*, No.

2   12108-VCL, 2017 WL 1437308, at *18 (Del. Ch. Apr. 24, 2017) ("the fiduciary relationship requires

3   that the directors act prudently, loyally, and in good faith to maximize the value of the corporation

4   over the long-term for the benefit of the providers of presumptively permanent equity capital"); *In re*

5   *Trados Inc. S'holder Litig.*, 73 A.3d 17, 42 n.16 (Del. Ch. 2013) ("the standard of fiduciary conduct

6   calls for the board to maximize the value of the corporation for the benefit of the common stock");

7   *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010) (same).

8   42.    A director who deviates from shareholder primacy commits a breach of fiduciary duty

9   for which he may be held liable:

10   Of course, it is true that the business judgment rule provides directors with wide
     discretion, and that it enables directors to justify by reference to long run stockholder
11   interests a number of decisions that may in fact be motivated more by a concern for a
     charity the CEO cares about, or the community in which the corporate headquarters
12   is located, or once in a while, even the company's ordinary workers, than long run
     stockholder wealth.  But that does not alter the reality of what the law is.  *Dodge v.*
13   *Ford* and *eBay* are hornbook law because they make clear that if a fiduciary admits
     that he is treating an interest other than stockholder wealth as an end in itself, rather
14   than an instrument to stockholder wealth, he is committing a breach of fiduciary
     duty.

15   Strine, *Dangers of Denial* at 20.

16   **Diversity Serves the Best Interests of Shareholders**
17   **Because It Maximizes Shareholder Wealth**

18   43.    In 2015, McKinsey, one of the world's largest and most prestigious management

19   consulting firms, observed the statistically significant connection between diverse leadership and

20   financial performance, finding that "[c]ompanies in the top quartile for racial/ethnic diversity were

21   35 percent more likely to have financial returns above their national industry median." *Diversity*

22   *Matters* at 1.  After examining proprietary datasets for 366 public companies, including financial

23   results and the composition of top management and boards, McKinsey found that "diversity

24   correlates with better financial performance," while the "reverse is also true, companies in the

25   bottom quartile in both gender and ethnicity underperformed the other three quartiles." *Id.* at 3.

26   44.    Moreover, the 2015 McKinsey report found that companies in the top quartile for

27   gender or racial and ethnic diversity are more likely to have financial returns above their national

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 13

1   industry median, while companies in the bottom quartile in these dimensions are statistically less

2   likely to achieve above-average returns:

> The analysis found a statistically significant relationship between a more diverse
> leadership team and better financial performance.  The companies in the top quartile
> of gender diversity were 15 percent more likely to have financial returns that were
> above their national industry median.  Companies in the top quartile of racial/ethnic
> diversity were 35 percent more likely to have financial returns above their national
> industry median.   Companies in the bottom quartile for both gender and
> ethnicity/race were statistically less likely to achieve above-average financial
> returns than the average companies in the dataset (that is, they were not just not leading, they
> were lagging).  The results varied by country and industry.  Companies with 10
> percent higher gender and ethnic/racial diversity on management teams and boards in
> the US, for instance, had EBIT that was 1.1 percent higher; in the UK, companies
> with the same diversity level had EBIT that was 5.8 percent higher.  Moreover, the
> unequal performance across companies in the same industry and same country
> implies that diversity is a competitive differentiator that shifts market share towards
> more diverse companies.

11   *Id*. at 1.

12          45.    In 2018, McKinsey updated its research and again found that more diverse firms

13   enjoy greater shareholder returns than less diverse firms, finding that ethnically diverse companies

14   are 35% more likely to financially outperform ethnically homogeneous ones.  Vivian Hunt, Sara

15   Prince, Sundiatu Dixon-Fyle & Lareina Yee, *Delivering through Diversity*, McKinsey & Company,

16   at 8 (Jan. 2018) ("*Delivering through Diversity*"), http://www.insurance.ca.gov/diversity/41-

17   ISDGBD/GBDExternal/upload/ McKinseyDeliverDiv201801-2.pdf.  As McKinsey explained:

> We first established a positive, statistically significant correlation between
> executive team diversity and financial performance in our 2015 *Why Diversity
> Matters* report (using 2014 diversity data).  We find this relationship persists in our
> expanded, updated, and global 2017 data set.  In *Why Diversity Matters* we found
> that companies in the top quartile for gender diversity on their executive teams were
> 15% more likely to experience above-average profitability than companies in the 4th
> quartile.  Almost exactly three years later, this number rose to 21% and continued to
> be statistically significant.  For ethnic/cultural diversity, the 2014 finding was a 35%
> likelihood of outperformance, comparable to the 2017 finding of a 33% likelihood of
> outperformance on EBIT margin, both statistically significant . . . .

23   *Id*. (footnotes omitted).

24          46.    Addressing boardroom diversity in particular, the 2018 *Delivering through Diversity*

25   report found that "[e]thnic and cultural diversity's correlation with outperformance on profitability

26   was also statistically significant at Board level," making companies with greater ethnic and cultural

27   board diversity 43% more likely to enjoy higher profits.  *Id*. at 13.  In other words, diversity provides

28

increased shareholder returns, which is in the best interests of the corporation and its shareholders. As McKinsey further explained:

> We found that companies with the most ethnically/culturally diverse Boards worldwide are 43% more likely to experience higher profits. We also found a positive correlation between ethnic/cultural diversity and value creation at both the executive team and Board levels, though the relationship is not statistically significant. It may be the case that overall, the picture on top-team diversity globally is more complex due to significant geographic differences in the cultural contexts in which the companies we studied operate.
>
> Overall, our findings that ethnic and cultural diversity on executive teams continues to correlate strongly with company financial performance support the argument that there is value in promoting ethnic/cultural diversity in company top teams around the world. We hypothesize that, for companies, addressing the challenge of building an inclusive company culture across cultural differences could significantly strengthen organizational effectiveness. Further, ethnic/cultural diversity at the highest levels of company leadership could serve as a signal to employees and other stakeholders that the organization truly understands and values the community and customers that they serve.

*Id.*

47.     And more recently, in May 2020, McKinsey reported that "[t]he business case for inclusion and diversity (I&D) is stronger than ever," finding "that companies in the top quartile outperformed those in the fourth by 36 percent in terms of profitability in 2019" and that, "[f]or diverse companies, the likelihood of outperforming industry peers on profitability has increased over time, while the penalties are getting steeper for those lacking diversity." *Diversity wins* at 3-4. As McKinsey explained:

> *Diversity Wins* is the third in a McKinsey series investigating the business case for diversity, following *Why Diversity Matters* (2015) and *Delivering through Diversity* (2018). This report shows not only that the business case remains robust, but also that the relationship between diversity on executive teams and the likelihood of financial outperformance is now even stronger than before. These findings are underpinned by our largest data set to date, encompassing 15 countries and more than 1,000 large companies.
>
> *          *          *
>
> In the case of ethnic and cultural diversity, the findings are equally compelling. We found that companies in the top quartile outperformed those in the fourth by 36 percent in terms of profitability in 2019, slightly up from 33 percent in 2017 and 35 percent in 2014. And, as we have previously found, there continues to be a higher likelihood of outperformance difference with ethnicity than with gender.
>
> *          *          *

> This growing polarization between high and low performers is reflected in an increased likelihood of a performance penalty.  In 2019, fourth-quartile companies for executive-team gender diversity were 19 percent more likely than companies in the other three quartiles to underperform on profitability.  This is up from 15 percent in 2017 and nine percent in 2015.  And for companies in the fourth quartile of both gender and ethnic diversity the penalty is even steeper in 2019:  they are 27 percent more likely to underperform on profitability than all other companies in our data set.

*Id*. (footnote omitted).

48.     These consistent findings demonstrate that firms with greater diversity outperform their peers by a significant margin.  Diversity is in the best interests of a corporation and its shareholders.  AMD "is committed to increasing the number of women and under-represented minorities in the technology industry" and "will actively identify candidates who could enhance the diversity represented on the Board." *Corporate Responsibility at AMD*; *Message from our President and CEO*, AMD, https://www.amd.com/en/corporate-responsibility/cr-amd (last visited Sept. 28, 2020); Charter of the Nominating and Corporate Governance Committee at 2-3.  In practice, however, this appears to be only lip-service, as AMD remains one of the few large U.S. publicly traded companies without an African American director in late September 2020.

**HUNDREDS OF MILLIONS IN POTENTIAL
SHAREHOLDER WEALTH SQUANDERED**

**The AMD Board of Directors and Executive Leadership Team**

49.     AMD enjoys the dubious distinction of being one of only a handful of publicly traded companies in the United States without an African American male or female director.  The Company's large executive leadership team likewise lacks a single black member.  The members of the AMD Board are:



50.     The members of AMD's executive leadership team are:





**Defendants' False Statements About the Company's Top Leadership Diversity**

51.    Privately, Defendants have consistently avoided the opportunity to appoint African Americans to AMD's Board and/or its senior executive leadership.  But publicly, however, Defendants, in pursuit of the accolades and awards that affirm true diversity leadership, have falsely portrayed AMD as a strong proponent of increasing diversity in the technology industry, and as a company that effectively promotes and achieves diversity across its enterprise.

**False Statements About Diversity on AMD's Website**

52.    For example, AMD's website not only recognizes diversity to be a key to success, but also highlights AMD's efforts to increase "the number of women and under-represented minorities in the technology industry, and to supporting efforts to effect systemic and lasting change." *Corporate Responsibility at AMD; Message from Our President and CEO*, AMD, https://www.amd.com/en/corporate-responsibility/cr-amd (last visited Sept. 28, 2020).  For example, Defendants caused AMD to represent:

- "AMD is growing a diverse, inclusive workforce that embraces different perspectives and experiences to foster innovation, challenge the status quo when needed, and drive business performance." *People; Global Inclusion*, AMD, https://www.amd.com/en/corporate-responsibility/people.

- "We are constantly striving to improve our gender and diversity numbers through specific programs, as is the case across the technology sector." *Id.*

- "We will continue our efforts to recruit diverse talent and foster an inclusive and innovative culture, where the best ideas 'win' regardless of the individual's identity." *Id.*

53.     Similarly, affirming Defendants' stated belief that diversity makes AMD "stronger" and "ultimately more profitable," *id.*, the Company's website further states:

- "Building a diverse talent pipeline, encouraging a culture of respect and belonging, and increasing inclusion of under-represented groups, makes AMD stronger." *Id.*

- "Innovation, which is at AMD's core, occurs when creative minds and diverse perspectives are drawn from all over the world.  Diverse teams, when managed in a culture of inclusion, are more creative, more productive, better at problem solving, and ultimately more profitable." 2020 CR Report at 30-31.

**False Statements About Diversity
in the AMD's Proxy Statements**

54.     Additionally, Defendants also falsified AMD's U.S. Securities and Exchange Commission ("SEC") filings.  While under the stewardship of Defendants, the Company's 2018, 2019 and 2020 Proxy Statements misrepresented that the AMD Board seeks to "foster and maintain a diversity of viewpoints, backgrounds and experience on the Board," and thus "the Nominating and Corporate Governance Committee evaluates the mix of skills and experience of the directors and assesses nominees and potential candidates in the context of the current composition of the Board and [AMD's] requirements, taking into consideration the diverse communities and geographies in which [AMD] operate[s]."  AMD, Proxy Statement (Sch. 14A) (Mar. 26, 2020) ("2020 Proxy Statement") at 17; AMD, Proxy Statement (Sch. 14A) (Mar. 21, 2019) ("2019 Proxy Statement") at 19; AMD, Proxy Statement (Sch. 14A) (Mar. 19, 2018) ("2018 Proxy Statement") at 19.

55.     The 2020 Proxy Statement further states that, as a part of succession planning for key executive roles, AMD assesses "candidates and their development plans . . . with considerations for alignment not only with required skills but also with [the Company's] culture and emphasis on diversity and inclusion."  2020 Proxy Statement at 36.

**False Statements About Diversity in AMD's
Corporate Social Responsibility Reports**

56.     Each year, at the direction of Defendants, the Company releases its annual Corporate Responsibility ("CR") Report.  In these reports, Defendants candidly recognize the correlation between diversity and increased shareholder wealth: "Building a diverse talent pipeline, encouraging

1  a culture of respect and belonging, and increasing inclusion of under-represented groups, makes

2  AMD stronger."  2020 CR Report at 31.

3    57.    Additionally, in the CR Reports, Defendants represent to shareholders and the public

4  that AMD effectively promotes diversity throughout the Company.  For example, the 2020 CR

5  Report states:

6    • "AMD is growing a diverse, inclusive workforce that embraces different perspectives
        and experiences to foster innovation, challenge the status quo when needed, and
7        drive business performance."  *Id.*

8    • "Aligned with the company's commitment to diversity and inclusion and in light of
        recent events that highlight the work still ahead to end racism and social injustice,
9        AMD announced its first steps to cultivate change with donations to high-impact
10        non-profits focused on social and racial equality and support for their empowerment,
        scholarship and mentorship programs."  AMD, Press Release, *AMD Commemorates*
11        *25 Years of Corporate Responsibility Reporting*, July 30, 2020.

12    • "We are constantly striving to improve our gender and diversity numbers through
        specific programs, as is the case across the technology sector."  2020 CR Report at
13        31.

14    • "Since 2018, we review annually our Diversity, Belonging, and Inclusion strategies
        and metrics with members of the AMD Board of Directors."  *Id.*
15

16    58.    AMD's 2019 and 2018 CR Reports contain similar statements representing that the

17  Company effectively promotes and achieves inclusion and diversity.  For example, the 2019 CR

18  Report states:

19        At AMD, we harness our world-class technology to take on some of the
        world's toughest problems.  This can't be done alone.  It takes a diverse group of
20        voices gathered together – every day of the week – to find solutions and drive our
        business growth.  We thrive through respect for and inclusion of our employees'
21        individual talents, personalities, experiences and passions.  Differences challenge us
        in a healthy way – and improve our capability to bring the benefits of high-
22        performance computing to consumers in a more meaningful manner.  From many
        voices, we create one vision of the future, together.
23

24  *AMD's Culture of Inclusion*, 2019 Corporate Citizenship Summary.

25  **The Statements About AMD's Diversity Were Knowingly False**

26    59.    AMD is not a leader in diversity and inclusion.  Other large Bay Area companies

27  have at least one African American director, including Apple, Inc., HP Inc., PayPal, Inc. and

28

1   Salesforce.com.  But, even in late September 2020, AMD still does not have a single black person on

2   its Board.  The Company's senior executive ranks are likewise devoid of any African Americans.

3        60.    Instead of pursuing racial diversity on the Board and elsewhere within the Company,

4   Defendants have not only made, or caused AMD to make, untrue statements about its commitment to

5   diversity, but also to have approved false statements that AMD has been successful in those efforts.

6   For example, the Company filed its 2020 Proxy Statement with the SEC on March 26, 2020, after it

7   was approved by directors Caldwell, Denzel, Durcan, Gregoire, Householder, Marren, Su and

8   Talwalkar.  And the Company filed its 2019 Proxy Statement with the SEC on March 21, 2019, after

9   it was approved by directors Caldwell, Denzel, Durcan, Householder, Marren, Su and Talwalkar.

10  The 2020 and 2019 Proxy Statements misleadingly used the phrase "foster and maintain a diversity

11  of viewpoints, backgrounds and experience on the Board" to suggest that the Nominating and

12  Corporate Governance Committee has a goal of achieving actual diversity on the Board by seeking

13  to achieve representation of diverse persons – *i.e.*, African Americans.  2020 Proxy Statement at 17;

14  2019 Proxy Statement at 19.

15       61.    Moreover, the representation in the 2019 and 2018 Proxy Statements that AMD

16  believes it is important to consider "a diversity of viewpoints, backgrounds and experience on the

17  Board" is misleading because a reasonable reading of that phrase conveys that the Company is

18  actively seeking to achieve diversity on its Board.  2019 Proxy Statement at 19; 2018 Proxy

19  Statement at 19.  Despite highlighting "race" as an important factor to achieving "diversity of

20  viewpoints, backgrounds and experience," the fact remains that AMD has no African American

21  Board members, and no African American has served on AMD's Board since at least 2015.  The

22  undisclosed truth is, therefore, that while AMD may maintain a policy that states it is attempting to

23  bring racially diverse candidates into its director nominee pool, it either has no intention of actually

24  nominating such persons to its Board or is engaged in an effort to thwart the nomination of such

25  persons and prefers applicants other than African Americans in the pool.

26

27

28

**The Compensation and Leadership Resources**
**Committee's Role in Keeping African Americans**
**Off the Board**

62.    AMD directors Denzel, Durcan and Talwalkar served on AMD's Compensation and Leadership Resources Committee at all relevant times.  The 2020 Proxy Statement states that "[t]he Compensation and Leadership Resources Committee of our Board (the 'Compensation Committee') oversees, among other things, the development and administration of our executive compensation program."  2020 Proxy Statement at 30.  Further, the 2020 Proxy Statement states that AMD's executive compensation philosophy is "'pay for performance.'"  *Id.* at 31.

> Our executive compensation program is designed to link the compensation payable to our Named Executive Officers to the achievement of performance objectives and returns to our stockholders and drive the creation of long-term sustainable stockholder value while balancing our goal of attracting, retaining and motivating high-caliber senior leadership.  This program is clearly delivering on its objectives . . . .  Our fiscal 2019 executive compensation program continued to reflect this "pay for performance" compensation philosophy, and the compensation earned by our Named Executive Officers in fiscal 2019 was primarily driven by our fiscal 2019 results . . . and our stock price performance.

*Id.*  As set forth below, AMD's "pay for performance" executive compensation plan "is guided by the following primary principles": "Business Driven," "Performance Differentiated," "Market Competitive" and "Ownership Oriented."  *Id.* at 37.

Our executive compensation program philosophy centers on pay for performance and is guided by the following primary principles:

| Principle | Description |
|---|---|
| Business Driven | Compensation should be aligned to performance.  Rewards should be directly tied to the achievement of specific financial, operational and strategic objectives that generally lead to increased and sustained stockholder value. |
| Performance Differentiated | Compensation should be structured to create an effective link between pay and performance at both the company and individual level.  With improved company performance and increases in company valuation and stock price, our compensation programs should deliver higher rewards to our Named Executive Officers. |
| Market Competitive | Compensation should be competitive to attract, retain and motivate high-caliber senior leadership. |
| Ownership Oriented | Compensation should be fully aligned with stockholder interests by delivering meaningful equity awards tied to and balanced with stockholder value creation and by maintaining robust stock ownership requirements. |

63.    As is evident, the "guiding principles" used by the Compensation and Leadership Resources Committee to determine annual CEO compensation do not include diversity and/or

1   increasing minority representation in the technology industry.  Instead, the principles focus on other

2   matters at the exclusion of diversity, although greater diversity is positively correlated with greater

3   shareholder returns.

4          64.      Further, the 2020 Proxy Statement states that, as a part of "[s]uccession planning for

5   key executive roles," the Compensation and Leadership Resources Committee assesses "internal

6   candidates and their development plans . . . with considerations for alignment not only with required

7   skills but also with our culture and emphasis on diversity and inclusion."  2020 Proxy Statement at

8   36.  Yet today, in 2020, AMD has failed to add an African American to its senior executive team.

9   **The Nominating and Corporate Governance Committee's**
    **Role in Keeping African Americans Off the Board**

10

11         65.      "The Nominating and Corporate Governance Committee assists the Board in its

12  responsibilities regarding the identification of qualified candidates to become Board members, the

13  selection of nominees for election as directors at the next annual meeting of stockholders (or special

    meeting of stockholders at which directors are to be elected) . . . ."  2020 Proxy Statement at 17.  At

14  all relevant times, directors Caldwell, Denzel, Durcan, Gregoire, Householder, Marren and

15  Talwalkar served on the AMD Board's Nominating and Corporate Governance Committee.

16

17         66.      The Charter of the Nominating and Corporate Governance Committee specifies the

18  criteria the Committee may use when evaluating a director candidate.  These criteria include, among

19  others, the candidate's: (i) proven records of success at their chosen profession; (ii) personal and

20  professional integrity, ethics and values; (iii) experience in corporate management, such as serving

21  as an officer or former officer of a publicly held company; (iv) experience in the Company's

22  industry; (v) awareness of relevant social policy concerns; (vi) experience as a board member of

23  another publicly held company; (vii) ability to make independent analytical inquiries; (viii) strategic

24  planning abilities and experience; (ix) aptitude in accounting or finance; (x) expertise in domestic

25  and international markets; (xi) experience in government relations; (xii) academic expertise in an

26  area of the Company's strategy or operations; and (xiii) practical and mature business judgment.

27  Charter of the Nominating and Corporate Governance Committee at 2-3.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                     - 23

67.    The Charter of the Nominating and Corporate Governance Committee further states that "[t]he Committee recognizes the great value in diversity of experience and perspective, including but not limited to diversity in gender, race, culture, nationality, background, age and professional experience," and, therefore, "[i]n identifying potential candidates, the Committee will actively identify candidates who could enhance the diversity represented on the Board." *Id.* at 3. Moreover, AMD's 2020 Proxy Statement states that, to broaden its reach, "[t]he Nominating and Corporate Governance Committee retains a search firm for the purpose of obtaining information regarding potential candidates for Board membership."  2020 Proxy Statement at 17.

68.    Ostensibly, these statements convey to AMD investors and the public that the Company actively promotes "diversity" in the boardroom.  But in fact, Defendants have made no real effort to promote racial diversity on the Board.  Today, in 2020, AMD is one of the few remaining large publicly traded companies without a black male or female director.  Likewise, no black person is a member of the executive leadership team at AMD.

69.    This lack of diversity has contributed to economic disparities at AMD.  For example, in 2018, the Company's CEO pay was 165 times as high as the median pay of all other employees:

For 2018:

- the annual total compensation for the median employee of the Company (other than our Chief Executive Officer) was $80,931; and

- the annual total compensation of our Chief Executive Officer was $13,356,392.

Based on this information, for 2018 the ratio of the annual total compensation of our Chief Executive Officer to the annual total compensation of the median employee was 165 to 1.  This ratio is a reasonable estimate calculated in a manner consistent with Item 402(u) of Regulation S-K under the Securities Exchange Act of 1934.

2019 Proxy Statement at 59 (footnote omitted).  In 2019, after excluding an extraordinary stock award, the Company's CEO pay still increased to 172 times as high as the median pay of all other employees:

The Pay Ratio is significantly higher in 2019 than it was in 2018 (when the Pay Ratio was 165 to 1) because the Company granted a special Value Creation Equity Award to our Chief Executive Officer in August 2019 in recognition of her unique value and contributions to the Company, to motivate and reward continued exceptional

1
2
3
4
5

shareholder value creation and to further incentivize long-term retention and dedication, which will be earned only if AMD continues to create long-term sustainable stockholder value over a five-year performance period. Since the Value Creation Equity Award is not part of the standard annual compensation that is paid to our Chief Executive Officer, we believe it is helpful to provide the pay ratio without the Value Creation Equity Award to provide a more normalized comparison to the median employee and our peers. For 2019, the ratio of the annual total compensation of our Chief Executive Officer without the Value Creation Equity Award to the annual total compensation of the median employee was 172 to 1.

6   2020 Proxy Statement at 69.

7       70.     The absence of significant performance metrics based on achievements in diversity in

8   executive compensation plans can spur economic disparities across an enterprise, as reflected by

9   AMD's dramatic (and increasing) CEO pay ratios of 165 to 1 and 171 to 1 in 2018 and 2019,

10  respectively.

11      71.     Leading Fortune 500 companies and top business schools have tied executive pay to a

12  myriad of business goals, like revenues, profits, share price and talent acquisition. For example,

13  "[a]chieving diversity goals helps determine one-sixth of the cash bonus of Microsoft's chief

14  executive, Satya Nadella," while at Uber, "[d]iversity targets are embedded in the stock

15  compensation of its chief executive, Dara Khosrowshahi, accounting for a fourth of his performance-

16  based stock awards." Peter Eavis, *Want More Diversity? Some Experts Say Reward C.E.O.s for It*,

17  N.Y. Times, July 14, 2020. As *The New York Times* reported, "[m]aking diversity targets part of

18  compensation and disclosing them would not just give top executives a financial incentive to hire

19  and promote more Black and Latino people, but also provide a public scorecard that employees and

20  shareholders could use to determine whether companies were following through on their

21  commitments." *Id.*

22      72.     Defendants have declined to link CEO pay to diversity, however. Financial

23  disincentives to recruit, hire, promote and retain African Americans at senior levels at AMD,

24  including in the boardroom and at the senior executive level, have harmed, and continue to harm, the

25  Company and its shareowners. Instead of acknowledging the problem and demanding change,

26  Defendants have instead issued false statements claiming success in achieving diversity and

27  inclusion in the face of this enormous wealth gap.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**The Role of AMD's Proxy Access and Majority**
**Voting Rules in Keeping African Americans**
**Off the Board**

73.     At AMD, one of the ways the Company has inhibited and prevented black candidates from being nominated to serve on the Board is through restrictive and unreasonable provisions that place a high bar on shareholders' ability to nominate candidates other than the incumbent directors. As admitted in the 2020 Proxy Statement:

> In addition, our bylaws permit certain of our stockholders who have beneficially owned 3% or more of our outstanding common stock continuously for at least three years to submit nominations to be included in the [sic] our proxy materials for up to 20% of the total number of directors then serving.

2020 Proxy Statement at 12.

74.     As this statement indicates, any AMD shareholder wanting to nominate a new individual to the Board – for example, a black person – must own at least 3% of the Company's stock. The 2020 Proxy Statement disclosed that on the "Record Date," *i.e.*, March 10, 2020, AMD had 1,170,852,297 shares outstanding. 2020 Proxy Statement at 1. Thus, 3% of AMD's outstanding shares equates to 35,125,568 shares. At AMD's current stock price of approximately $78 per share, a shareholder would have to own $2.7 billion worth of AMD stock to have the right to nominate an African American individual to the AMD Board. This is yet one more structure preventing an African American board member on the AMD Board.

75.     But the restrictions do not end there. AMD's Proxy Statements state that the Company's corporate governance policies provide for a majority voting standard in uncontested elections of directors. "This standard requires that each director receive the affirmative vote of a majority of the votes cast. A majority of the votes cast means that the number of votes cast 'for' a director must exceed the number of votes cast 'against' that director. Abstentions and broker non-votes will have no effect on the outcome of these director elections." 2020 Proxy Statement at 13. But AMD's facially neutral majority voting rule, as applied by Defendants, operates to entrench current directors in office and thus prevents the necessary refreshment that would allow African Americans to receive a fair considered for election to the AMD Board. As a result, the application

of the Company's corporate governance policies by Defendants has enabled them to preserve a lack of racial diversity on the Board.

76.     Moreover, the Proxy Statements were false and misleading because they failed to disclose that the effect of the majority voting rules inhibited the consideration of African Americans for appointment and/or election to the AMD Board.  These material omissions would have been material to a shareholder's decision as to whether to reelect the incumbent directors at the annual meeting.  The false Proxy Statements harmed the Company by interfering with the mechanisms for the election of directors by shareholders.  As a result of the false or misleading statements in the Proxy Statements, AMD shareholders voted to reelect Defendants to the Board each year.

**The Absence of Term Limits Discourages the**
**Nomination of Racial Minorities to the Board**

77.     A review of AMD's Proxy Statements reveals that the Company does not have term limits for directors.  But the unstated purpose of the lack of term limits at AMD is to entrench current directors in office, which effectively prevents African Americans from having a fair opportunity to be considered for the AMD Board.  To attempt to justify this position, Defendants claim that individuals who have served on the AMD Board for years have experience that is valuable to the Company.  In practice, however, excessive tenure for directors does not serve the best interests of the corporation, as demonstrated by leading academics and professionals in the field of best corporate governance principles.  *See, e.g.*, Jon Lukomnik, *Board Refreshment Trends at S&P 1500 Firms*, Harvard Law School Forum on Corporate Governance (Feb. 9, 2017), https://corpgov.law.harvard.edu/2017/02/09/board-refreshment-trends-at-sp-1500-firms.

78.     Defendants' refusal to adopt director term limits and to appoint African American members to the Board betrays an improper and far-too-long-unchallenged pretext for denying African Americans a seat on the AMD Board.  This has harmed AMD by allowing Defendants to perpetuate a shortage of racial diversity on the AMD Board.

79.     Moreover, the Proxy Statements were false and misleading because they did not disclose the true reasons for, and effect, as applied, of, AMD's lack of term limits.  These omissions, had they been disclosed, would have been material to AMD shareowners' decision as to whether to

1   reelect the Board nominees and vote in favor or against the "say on pay" executive compensation

2   proposals.  Diversity and inclusion are highly valued by shareowners.  The false Proxy Statements

3   harmed the Company by interfering with the mechanism for electing directors to the AMD Board.

4   As a result of the false or misleading statements in the Proxy Statements, AMD shareowners voted to

5   reelect Defendants to the Board each year.

6   **Defendants Have Enriched Themselves at the Expense**
    **of AMD's Shareholders by Making Misleading**
7   **Statements About AMD's Commitment to Diversity**

8          80.    In addition to denying AMD the substantial increases in shareholder value enjoyed by

9   companies with greater board diversity, by entrenching themselves on AMD's Board, Defendants

10  have benefited financially by paying themselves millions of dollars in cash and stock awards each

11  year.  *See Delivering through Diversity* at 13 ("We found that companies with the most

12  ethnically/culturally diverse Boards worldwide are 43% more likely to experience higher profits.").

13         81.    The Charter of the Nominating and Corporate Governance Committee states that its

14  members shall, among other things, "actively identify candidates who could enhance the diversity

15  represented on the Board."  Charter of the Nominating and Corporate Governance Committee at 2-3.

16  Similarly, with regard to the criteria for the selection of directors, the 2020 Proxy Statement states:

17         Although we do not have a formal diversity policy, to foster and maintain a diversity
           of viewpoints, backgrounds and experience on the Board, the Nominating and
18         Corporate Governance Committee evaluates the mix of skills and experience of the
           directors and assesses nominees and potential candidates in the context of the current
19         composition of the Board and our requirements, taking into consideration the diverse
           communities and geographies in which we operate.
20

21  *Id.* at 17.

22         82.    At all relevant times, directors Caldwell, Denzel, Durcan, Gregoire, Householder,

23  Marren and Talwalkar served on the Nominating and Corporate Governance Committee of the AMD

24  Board.  But rather than uphold AMD's commitment "to foster and maintain a diversity of

25  viewpoints, backgrounds and experience on the Board" in the selection criteria for new Board

26  members, Caldwell, Denzel, Durcan, Gregoire, Householder, Marren and Talwalkar chose instead to

27  perpetuate AMD's exclusion of African American directors under the pretext that the existing

28  members constitute a diverse board.  Consequently, many qualified black candidates who would

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 28 -

have allowed AMD and its shareholders to benefit from the perspectives of an African American on the AMD Board have been excluded.  The following chart sets forth the compensation earned by AMD directors in 2019:

| Name | Fees Earned or Paid in Cash[1] ($) | Stock Awards[2][3] ($) | Total ($) |
|---|---|---|---|
| John E. Caldwell | 152,500 | 275,579 | 428,079 |
| Nora M. Denzel | 127,228 | 183,710 | 310,938 |
| Mark Durcan | 134,396 | 183,710 | 318,106 |
| Michael Gregoire[4] | 5,421 | 196,944 | 202,365 |
| Joseph A. Householder | 130,000 | 183,710 | 313,710 |
| Michael J. Inglis | 52,308 | — | 52,308 |
| John W. Marren | 105,000 | 183,710 | 288,710 |
| Abhi Y. Talwalkar | 117,582 | 183,710 | 301,292 |
| Ahmed Yahia | 35,495 | — | 35,495 |

2020 Proxy Statement at 19 (footnotes omitted).

83.    Directors Denzel, Durcan and Talwalkar at all relevant times served on the AMD Board's Compensation and Leadership Resources Committee.  In addition to receiving lucrative compensation themselves, they also lavished extraordinary executive compensation on AMD's CEO and other named executive officers.  AMD's principal executive officers are not racially diverse. AMD's 2019 executive compensation is set forth below:

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($)(2) | Option Awards ($)(3) | Non-Equity Incentive Plan Compensation ($)(4) | All Other Compensation ($)(5) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Lisa T. Su | | | | | | | | |
| President and Chief Executive Officer | 2019 | 1,026,442 | — | 53,176,357 | 3,087,749 | 1,228,476 | 15,264 | 58,534,288 |
| | 2018 | 961,057 | — | 8,622,801 | 2,500,318 | 1,241,625 | 30,591 | 13,356,392 |
| | 2017 | 924,997 | — | 6,980,740 | 1,897,770 | 1,076,700 | 14,614 | 10,894,821 |
| Devinder Kumar | | | | | | | | |
| Senior Vice President, Chief Financial Officer and Treasurer | 2019 | 572,210 | — | 2,223,098 | 609,534 | 427,085 | 14,125 | 3,846,052 |
| | 2018 | 557,204 | — | 2,011,962 | 583,407 | 479,450 | 13,859 | 3,645,882 |
| | 2017 | 539,615 | — | 1,745,181 | 474,441 | 419,040 | 13,615 | 3,191,892 |
| Rick Bergman | | | | | | | | |
| Executive Vice President, Computing and Graphics Business Group | 2019 | 230,768 | 500,000 | 6,657,033 | 662,543 | 181,229 | 9,423 | 8,240,996 |
| Darren Grasby | | | | | | | | |
| Senior Vice President and | 2019 | 517,699 | 545,187 | 3,187,128 | 857,405 | 389,135 | 22,052 | 5,518,606 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Chief Sales Officer, President EMEA(6) | | | | | | | |
| **Mark D. Papermaster** | | | | | | | |
| Chief Technology Officer and Executive Vice President, Technology and Engineering | 2019 | 621,056 | — | 15,119,119 | 927,560 | 466,250 | 25,127 | 17,159,112 |
| | 2018 | 587,015 | — | 2,874,245 | 833,434 | 505,250 | 13,938 | 4,813,882 |
| | 2017 | 611,328(7) | — | 1,963,340 | 533,748 | 436,500 | 16,702 | 3,561,618 |
| **Sandeep Chennakeshu** | | | | | | | |
| Former Executive Vice President, Computing and Graphics Business Group | 2019 | 378,085(8) | 300,000 | 9,235,630 | 685,904 | — | 13,707 | 10,613,326 |

2020 Proxy Statement at 55 (footnotes omitted).

**Minority-Majority Demographic Shifts and
Advances in Artificial Intelligence Urgently Call
for Greater Board-Level Diversity**

84.     America is in the midst of a well-documented minority-majority demographic shift. At the same time, the more widespread availability of new technologies, like algorithms, linked with Artificial Intelligence ("AI") and Big Data, is creating the potential for their use as 21st century tools of racism.  These shifts in American culture and commerce, and their attendant challenges – and potential perils – underscore the urgency for racial and ethnic diversity on corporate boards of directors.

85.     As *Axios* reported on April 29, 2019, "[b]y 2045, the U.S. as a whole is projected to become majority minority.  And the changes are already underway:  non-white Americans are now the majority of the population in four states, as well as in the most prosperous and powerful U.S. cities."   Stef W. Kight, *America's minority majority future*, Axios (Apr. 29, 2019), https://www.axios.com/when-american-minorities-become-the-majority-d8b3ee00-e4f3-4993-8481-93a290fdb057.html.

86.     For companies unable to adapt, this shift is a potentially existential threat, as *Fast Company* reported on January 27, 2020:

> Many companies and executives have repeatedly pledged their commitment to diversity and inclusion efforts, often with little to show for it.  Soon they'll have no choice but to act.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                        - 30

1

\*      \*      \*

> "If there's an unwillingness to revamp the culture to meet the needs and desires of this changing workforce, then those companies are going to be left behind . . . . Talent is going to shift over to a lot of these smaller, more disruptive, more nimble companies."

Pavithra Mohan, *How the end of the white majority could change office dynamics in 2040*, Fast Company (Jan. 27, 2020), https://www.fastcompany.com/90450018/how-the-end-of-the-white-majority-could-change-office-dynamics-in-2040.

87.     The need for more robust diversity is no more critically urgent than in the technology sector.  With the growing acknowledgment that new facially neutral technologies, like AI and Big Data, may be automating and reinforcing racism and oppression, achieving greater racial diversity at the top and throughout Silicon Valley daily grows more urgent.  Indeed, a recent July 15, 2020 report to the United Nations Human Rights Council on emerging digital technologies and discrimination found that "[e]merging digital technologies driven by big data and artificial intelligence are entrenching racial inequality, discrimination and intolerance."  *Emerging digital technologies entrench racial inequality, UN expert warns*, United Nations Human Rights, Office of the            High            Commissioner            (July            15,            2020), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=26101&LangID=E. Specifically, the report authored by E. Tendayi Achiume, a United Nations Special Rapporteur on racism and independent United Nations human rights expert, concluded that "[t]echnology produced in such fields that disproportionately exclude women, racial, ethnic and other minorities is likely to reproduce these inequalities when it is deployed," and that "[p]roducing technology that works within complex social realities and existing systems requires understanding social, legal and ethical contexts, which can only be done by incorporating diverse and representative perspectives as well as disciplinary expertise."

> Emerging digital technology sectors, such as those in Silicon Valley, are characterized by a "diversity crisis" along gender and race lines, especially at the highest levels of decision-making. . . .  "[C]urrently, large scale AI systems are developed almost exclusively in a handful of technology companies and a small set of elite university laboratories, spaces that in the West tend to be extremely white, affluent, technically oriented, and male.  These are also spaces that have a history of problems of discrimination, exclusion, and sexual harassment." . . . "[T]his is much more than an issue of one or two bad actors: it points to a systematic relationship

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 31

1     between patterns of exclusion within the field of AI and the industry driving its
2     production on the one hand, and the biases that manifest in the logics and application
      of AI technologies on the other."

3   E. Tendayi Achiume, *Racial discrimination and emerging digital technologies: a human rights*

4   *analysis*,         Human         Rights         Council,         ¶17         (June         18,         2020),

5   https://www.ohchr.org/EN/HRBodies/HRC/RegularSessions/Session44/Documents/A_HRC_44_57

6   _AdvanceEditedVersion.docx (footnotes omitted).

7        88.    Left unchecked, these risks can result in company exposure to large damages, fines

8   and penalties.  In March 2019, the U.S. Housing and Urban Development ("HUD") agency sued

9   Facebook for housing discrimination because its ad-targeting technology allegedly allowed property

10  owners to target their properties to Facebook users based on race and other factors.  Kaya Yurieff,

11  *HUD charges Facebook with housing discrimination in ads*, CNN Business (Mar. 28, 2019),

12  https://www.cnn.com/2019/03/28/tech/facebook-hud-ad-discrimination/index.html.  Announcing the

13  filing, HUD Secretary Ben Carson stated:  "'Facebook is discriminating against people based upon

14  who they are and where they live . . . .  Using a computer to limit a person's housing choices can be

15  just as discriminatory as slamming a door in someone's face.'"  *Id.*

16       89.    The demographic shifts and technological advancements currently underway are

17  impacting, and will continue to impact, America's publicly traded corporations.  If these vital

18  engines of American economic growth cannot adjust, these shifts may become existential threats to

19  their ability to continue as going concerns.

20       90.    Racially and ethnically diverse directors and executives reflect these changes, and

21  their diverse backgrounds, experiences, perspectives, and skills can help corporate boards of

22  directors successfully navigate the minority-majority changeover and threats posed by AI and similar

23  technologies becoming 21st century tools of racism and oppression.  Despite the multi-fold benefits

24  to the Company and its shareholders, Defendants have opted to effectively exclude African

25  Americans from AMD's Board.  By doing so, they are breaching their fiduciary duty to act in the

26  best interests of AMD and its shareholders.

27                    **DERIVATIVE ALLEGATIONS**

28       91.    Plaintiff incorporates ¶¶1-90.

92.    The AMD Board has eight members:  Defendants Caldwell, Denzel, Durcan, Gregoire, Householder, Marren, Talwalkar and Su.  A pre-suit demand on the AMD Board to commence this action is excused as a futile.

93.    Defendants' failure to nominate a single African American to AMD's Board, despite their publicly stated diversity objectives, belies the falsity of Defendants' public assertions that AMD "is committed to increasing the number of women and under-represented minorities in the technology industry" and "will actively identify candidates who could enhance the diversity represented on the Board."  *Corporate Responsibility at AMD*; *Message from our President and CEO*, AMD, https://www.amd.com/en/corporate-responsibility/cr-amd; Charter of the Nominating and Corporate Governance Committee at 2-3.

94.    Defendants' unwillingness to nominate a single African American man or woman to AMD's Board is antithetical to their fiduciary duty act in the best interests of the Company and its shareholders.  At AMD, the members of the Board serve for a period of one year at a time.  Thus, just over the past few years, Defendants collectively have had 24 opportunities to nominate an African American candidate to AMD's Board.  But each time, Defendants declined to do so.

95.    That chance spoiled so many opportunities for an African American director on AMD's Board strains credulity.  Especially since, during this same time period, the Company's corporate governance principles, shareholder and corporate citizenship reports, and website postings reveal that Defendants made, or caused AMD to make, public statements affirming AMD's commitment to diversity at the top and holding AMD out as a company that actively promotes and achieves measurable diversity objectives.

96.    African American men and women are proven leaders in every segment of society, including academy, the armed forces, business, industry, law, healthcare, science and technology.  Yet today, in late 2020, there are no African Americans on AMD's Board.  This failure is not because of a shortage of qualified male or female African American director candidates.  This failure is because Defendants have declined to exert the will or expend effort consistent with the Company's public statements and because the failure to speak candidly about actually achieving racial diversity

1    on AMD's Board.   The combination of these two factors amounts to a breach of Defendants'

2    fiduciary duty to act in the best interests of AMD and its shareholders.

3           97.     AMD's headquarters are located in one of the most economically vibrant and

4    demographically diverse locations in the world – the San Francisco Bay Area.  Near AMD are three

5    of the world's most prestigious academic and research institutions – UC Berkeley, Stanford

6    University and University of San Francisco.  UC Berkeley and Stanford alumni and faculty from

7    these universities and other prestigious universities throughout the Bay Area have become leaders in

8    business, law, technology, medicine, education and government.  They are top executives of Fortune

9    500 companies, managing partners of international law firms, and former Presidential cabinet-level

10   secretaries and advisors.   And many of those alumni and faculty are African American men and

11   women too.   AMD's close proximity to an extraordinarily talented pool of potential director

12   candidates, combined with Defendants' failure to nominate African American men and/or women to

13   the AMD Board, is entirely inconsistent with their stated intention to promote diversity at the top of

14   AMD.

15          98.     The case for racial and ethnic diversity in the boardroom is now overwhelming.  In

16   2018, McKinsey found "that companies with the most ethnically/culturally diverse Boards

17   worldwide are 43% more likely to experience higher profits." *Delivering through Diversity* at 13.

18   Recognizing diversity enhances shareholder wealth.  Other Bay Area companies in general, and

19   Silicon Valley companies in particular, have African American directors.   These companies

20   presently enjoy the benefits of the demographic and cognitive diversity that African American

21   directors bring to boards of directors. But not AMD.  Defendants' dereliction of their fiduciary duty

22   to maximize corporate value has injured AMD and its shareholders.   Defendants are substantially

23   liable to AMD for the resulting damages.

24          99.     The business judgment rule is not a litigation bar to Defendants' substantial liability

25   for false statements about their own and AMD's commitment to diversity.  And its application in this

26   case could accentuate the harm already done by Defendants' false statements.  Rather than remove

27   the obstacles keeping AMD from achieving its stated diversity objectives, the business judgment rule

28   could unwittingly reinforce the historical impediments holding AMD back.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 34 -

100.     In this time of reckoning, leaders in the judiciary across the country are in the process of examining their historical practices, policies and procedures for unconscious bias that may unfairly discriminate against people of color. *See, e.g.*, Mike Scarcella, '*Our Moral Imperative' – Washington State Justices Issue Open Letter Confronting Racial Injustice*, Nat. L. J. (June 5, 2020), https://www.law.com/nationallawjournal/2020/06/05/our-moral-imperative-washington-state-justices-issue-open-letter-confronting-racial-injustice/; *State court statements on racial justice*, Nat. Center for State Courts (2020) (collecting statements on racial justice issued by the chief justices or similar leaders of over 20 state judicial systems and the District of Columbia), https://www.ncsc.org/newsroom/state-court-statements-on-racial-justice (last visited Sept. 28, 2020). The business judgment rule, a form of privilege itself, should not be above similar scrutiny. Especially in an action like this, which seeks to hold Defendants accountable for the absence of any male or female African American directors on AMD's Board, despite Defendants' public proclamations that AMD "is committed to increasing the number of women and under-represented minorities in the technology industry" and "will actively identify candidates who could enhance the diversity represented on the Board." *Corporate Responsibility at AMD*; *Message from our President and CEO*, AMD, https://www.amd.com/en/corporate-responsibility/cr-amd; Charter of the Nominating and Corporate Governance Committee at 2-3.

101.     Defendants' dereliction of their fiduciary duties to speak honestly about AMD's commitment to diversity and maximize corporate value is not in the best interests of the Company and its shareholders.  Given the gravity of the claims, there is ample reason to doubt that Defendants can adequately detach themselves from not just the facts alleged, but also from the financial, social and reputational dynamics at play, to fairly consider a pre-suit demand.  Without full confidence in Defendants' ability, individually and collectively, to evaluate a pre-suit demand with disinterest, impartiality and objectivity, and without concern for any personal considerations, financial or otherwise, a pre-suit demand on the AMD Board to commence this action is excused as futile.

102.     Plaintiff has not made any demand on AMD shareholders to institute this action since such demand would be a futile and useless act for several reasons.  First, AMD is a publicly traded company with more than 1.1 billion shares outstanding, held by hundreds or thousands of individuals

and entities spread throughout the country.   Second, making demand on such a number of shareholders spread throughout the country would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders.   Third, making demand on all shareholders would force Plaintiff to incur significant expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against All Defendants for Violation of §14(a)
### of the Exchange Act and SEC Rule 14a-9

103.   Plaintiff incorporates ¶¶1-102, except to the extent those allegations plead knowing or reckless conduct by Defendants.   This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.   Plaintiff specifically disclaims any allegations of, reliance upon any allegations of, or reference to any allegations of fraud, scienter or recklessness with regard to this claim

104.   Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9(a).

105.   The Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing AMD to publicly claim support for diversity and inclusion across the Company's enterprise.   Defendants have confirmed through their actions (and lack thereof) that they are not committed to true diversity throughout AMD's ranks, including in the boardroom, facts that Defendants were aware of and participated in as set forth herein.

106.   In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading when issued.

107.   The misrepresentations and omissions in the Proxy Statements were material to Plaintiff and would be material to reasonable investors who voted on each Proxy Statement.   The Proxy Statements were an essential link in AMD shareholders following the Company's

1   recommendation to re-elect Defendants to the AMD Board and approve the executive pay packages,

2   as revelations of the truth would have immediately thwarted a continuation of the shareholders'

3   endorsement of the directors' positions and the executive officers' compensation.

4       108.    The Company was damaged as a result of the material misrepresentations and

5   omissions in the Proxy Statements.

6                                       **COUNT II**

7                       **Against All Defendants for Breach of Fiduciary Duty**

8       109.    Plaintiff incorporates ¶¶1-102.

9       110.    Defendants owed and owe AMD fiduciary obligations.  By reason of their fiduciary

10  relationships, Defendants owed and owe AMD the highest obligation of loyalty, good faith, due care,

11  oversight and candor.

12      111.    Defendants violated and breached their fiduciary duties of loyalty, good faith, due

13  care, oversight and candor.

14      112.    Specifically, each of the Defendants, in breach of their fiduciary duties of care,

15  loyalty and good faith, intentionally or recklessly caused the Company to disseminate to AMD

16  shareholders materially misleading and inaccurate information through, among other things, the SEC

17  filings and other public statements and disclosures as detailed herein.  Defendants had actual

18  knowledge of their misrepresentations and omissions of material fact or acted with reckless disregard

19  for the truth in failing to ascertain and disclose such facts even though such facts were available to

20  them.

21      113.    As a direct and proximate result of Defendants' conscious failure to perform their

22  fiduciary obligations, AMD has sustained significant damages.  As a result of the misconduct alleged

23  herein, Defendants are liable to the Company.  Defendants breached their fiduciary duties owed to

24  AMD and its shareholders by willfully, consciously and/or intentionally failing to perform their

25  fiduciary duties to act in the best interests of AMD and its shareholders to maximize corporate value.

26                                      **COUNT III**

27                       **Against All Defendants for Unjust Enrichment**

28      114.    Plaintiff incorporates ¶¶1-102.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 37 -

115.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of AMD.  Defendants were unjustly enriched by their receipt of compensation while breaching fiduciary duties owed to AMD.

116.     Plaintiff, as a representative of the Company, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all damages, injuries and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that Defendants do not participate therein or benefit thereby;

B.     Directing all Defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees and insider sales proceeds, and imposing a constructive trust thereon;

C.     Directing AMD to take all necessary actions to remove the institutional structures preventing the Company from achieving its stated diversity objectives, including, but not limited to, adopting, implementing and maintaining the following initiatives, policies and procedures designed to promote greater racial diversity, equity and inclusion:

(i)     Nominate three new persons to serve on the AMD Board, which candidates shall include three African Americans to replace three current AMD directors;

(ii)     Invest $100 million in economic and social justice programs for the African American community designed to address historical racial disparities;

(iii)     Fill 15% of all new positions in the United States with African Americans;

(iv)     Finance 100 education scholarships valued at $100,000 each for K-12 African American students annually at partner schools located in the communities in which the Company does business;

1          (v)     Invest in the Company's talent pipeline by creating and/or expanding

2 connections with historically black colleges and universities located in the United States;

3          (vi)    Give diversity, equity and inclusion sustained C-suite support by shifting from

4 preventative measures, such as anti-bias training, to proactive ones, such as increasing the number of

5 African American candidates considered for open positions and rewarding the people who contribute

6 to the Company's success;

7          (vii)   Develop a program to ensure fair and equitable hiring across the Company –

8 to remove hiring bias, increase representation of African Americans within senior corporate

9 leadership, management and supervisory ranks, and create more board-level accountability and

10 oversight for the advancement of diversity and inclusion practices and systems within the Company;

11         (viii)  Provide managers the skills they need to support diversity, equity and

12 inclusion efforts; and

13         (ix)    Create a public-facing dashboard reporting the Company's progress, which

14 shall identify, among other things:

15              (1)     the representation of African American women in the United States at

16 the vice president and above level;

17              (2)     the representation of African Americans in the United States at the

18 vice president and above level;

19              (3)     the representation of African American men and women on the AMD

20 Board;

21              (4)     the percentage of AMD's workforce actively engaged in promoting the

22 Company's diversity, equity and inclusion efforts; and

23              (5)     the names of the African American-owned businesses located in the

24 United States the Company has partnered with during the fiscal year;

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                - 39 -

1       D.     Awarding punitive damages;

2       E.     Awarding costs and disbursements of this action, including reasonable attorneys' and

3  experts' fees; and

4       F.     Granting such other and further relief as this Court may deem just and proper.

5                                **JURY DEMAND**

6      Plaintiff hereby demands a trial by jury.

7  DATED:  September 29, 2020        ROBBINS GELLER RUDMAN
                                                &amp; DOWD LLP

8                                    SHAWN A. WILLIAMS

9

10                                   *s/ Shawn A. Williams*
                                    SHAWN A. WILLIAMS

11

12                                  Post Montgomery Center
                                  One Montgomery Street, Suite 1800

13                                  San Francisco, CA  94104
                                  Telephone:  415/288-4545

14                                  415/288-4534 (fax)

15                                  ROBBINS GELLER RUDMAN
                                  &amp; DOWD LLP

16                                  DARREN J. ROBBINS
                                  TRAVIS E. DOWNS III

17                                  BENNY C. GOODMAN III
                                  655 West Broadway, Suite 1900

18                                  San Diego, CA  92101
                                  Telephone:  619/231-1058

19                                  619/231-7423 (fax)

20                                  Attorneys for Plaintiff

21                                  ASHERKELLY
                                  MATTHEW I. HENZI

22                                  25800 Northwestern Highway, Suite 1100
                                  Southfield, MI  48075

23                                  Telephone:  248/746-2710
                                  248/747-2809 (fax)

24                                  Additional Counsel for Plaintiff

25

26

27

28

**VERIFICATION**

I, Craig Storum_____, as Chairman_____ of the City of Pontiac Police and

Fire Retirement System ("City of Pontiac"), acting on behalf of and with the consent of City of

Pontiac, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative

Complaint for Breach of Fiduciary Duty, Unjust Enrichment and Violations of the Federal Securities

Laws ("Complaint") and that City of Pontiac authorized the filing of the Complaint and that the

foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 29 day of September_____, 2020.

CITY OF PONTIAC POLICE AND FIRE
RETIREMENT SYSTEM

By: _____