1

**LATHAM & WATKINS LLP**
Elizabeth L. Deeley (Bar No. 230798)
 *elizabeth.deeley@lw.com*
Morgan E. Whitworth (CA Bar No. 304907)
 *morgan.whitworth@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111
T: +1.415.391.0600 / F: +1.415.395.8095

**LATHAM & WATKINS LLP**
William J. Trach (*pro hac vice*)
 *william.trach@lw.com*
200 Clarendon Street
Boston, MA 02116
T: +1.617.948.6000 F:+1.617.948.6001

2

3

4

5

**LATHAM & WATKINS LLP**
Jason C. Hegt (*pro hac vice*)
 *jason.hegt@lw.com*
885 Third Avenue, Suite 1000
New York, New York 10022
T: +1.212.906.1200 / F: +1.212.751.4864

**LATHAM & WATKINS LLP**
Hilary H. Mattis (Bar No. 271498)
 *hilary.mattis@lw.com*
140 Scott Drive
Menlo Park, California 94025
T: +1.650.328.4600 / F: +1.650.463.2600

6

7

8

9

*Attorneys for John E. Caldwell, Nora M. Denzel,*
*Mark Durcan, Michael P. Gregoire, Joseph A.*
*Householder, John W. Marren, Abhi Y. Talwalkar,*
*Lisa T. Su and Nominal Defendant Advanced Micro*
*Devices, Inc.*

10

11

12

UNITED STATES DISTRICT COURT

13

NORTHERN DISTRICT OF CALIFORNIA

14

SAN JOSE DIVISION

15

16

CITY OF PONTIAC POLICE AND FIRE
RETIREMENT SYSTEM, Derivatively on
Behalf of ADVANCED MICRO DEVICES,
INC.,

                    Plaintiff,

          vs.

JOHN E. CALDWELL, NORA M. DENZEL,
MARK DURCAN, MICHAEL P.
GREGOIRE, JOSEPH A. HOUSEHOLDER,
JOHN W. MARREN, ABHI Y.
TALWALKAR and LISA T. SU,

                    Defendants,

– and –

ADVANCED MICRO DEVICES, INC., a
Delaware corporation,

                    Nominal Defendant.

CASE NO. 5:20-cv-06794-LHK

**DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS PLAINTIFF'S
VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT, AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT**

Hearing:  April 8, 2021
Time:      1:30 p.m.
Location: Courtroom 8 – 4th Floor
Judge:     Hon. Lucy H. Koh

Action filed September 29, 2020

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................... 5

  A. AMD's Global Semiconductor Business ................................................ 5

  B. AMD's Commitment To Diversity ........................................................ 5

  C. AMD's Financial Success Under The Current Leadership Team ......................... 7

  D. Plaintiff Files This Lawsuit.................................................................... 7

III. PLAINTIFF CANNOT MAINTAIN THIS ACTION ON BEHALF OF AMD ............................................................................................................... 8

  A. Legal Standard for Demand Futility ...................................................... 9

  B. Plaintiff Fails To Plead A Substantial Likelihood Of Personal Liability For Breach Of Fiduciary Duty Or Unjust Enrichment......................... 11

  C. Plaintiff Fails To Plead A Substantial Likelihood Of Personal Liability For Violation Of Section 14(a) Of The Exchange Act ......................... 20

IV. CONCLUSION.................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*In re Accuray, Inc. S'holder Deriv. Litig.*,
  757 F. Supp. 2d 919 (N.D. Cal. 2010) .......................................................................9

*Arduini v. Hart*,
  774 F.3d 622 (9th Cir. 2014) .................................................................................13

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ................................................................................10, 13

*In re Autodesk, Inc., S'holder Deriv. Litig.*,
  2008 WL 5234264 (N.D. Cal. Dec. 15, 2008) .....................................................12

*In re Baxter Int'l, Inc. S'holders Litig.*,
  654 A.2d 1268 (Del. Ch. 1995) .............................................................................12

*Bhonagiri v. Pandey*,
  2020 WL 5893404 (N.D. Cal. Oct. 5, 2020) .........................................................10

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ..............................................................................4, 9, 10

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) .................................................................................15

*Canty v. Day*,
  13 F. Supp. 3d 333 (S.D.N.Y. 2014).....................................................................10

*In re Caremark Int'l., Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996)..........................................................................17, 19

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) ......................................................................................19

*In re Citigroup Inc. S'holder Deriv. Litig.*,
  964 A.2d 106 (Del. Ch. 2009)............................................................................9, 19

*City of Birmingham Ret. and Relief Sys. v. Good*,
  177 A.3d 47 (Del. 2017)...................................................................................12, 17

*In re CNET Networks, Inc. S'holder Deriv. Litig.*,
  483 F. Supp. 2d 947 (N.D. Cal. 2007) .............................................................14, 20

*In re Columbia Pipeline, Inc.*,
   405 F. Supp. 3d 494 (S.D.N.Y. 2019)........................................................................20

*Corwin v. Bresler*,
   741 F.2d 410 (D.C. Cir. 1984)..................................................................................24

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984)....................................................................................................3

*Desaigoudar v. Meyercord*,
   223 F.3d 1020 (9th Cir. 2000) .....................................................................20, 22, 23

*Desimone v. Barrows*,
   924 A.2d 908 (Del. Ch. 2007)...................................................................................12

*In re Diamond Foods, Inc. Deriv. Litig.*,
   2012 WL 1945814 (N.D. Cal. May 29, 2012) ..........................................................24

*Gaines v. Haughton*,
   645 F.2d 761 (9th Cir. 1981) ..............................................................................23, 24

*Gamco Asset Mgmt., Inc. v. iHeartMedia, Inc.*,
   2016 WL 6892802 (Del. Ch. Nov. 29, 2016) ..........................................................11

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
   2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ...........................................................13

*Golub v. Gigamon Inc.*,
   2019 WL 4168948 (N.D. Cal. Sept. 3, 2019) ..........................................................21

*Guo v. Mahaffy*,
   2020 WL 5798531 (D. Colo. Sept. 29, 2020) ..........................................................23

*Guth v. Loft, Inc.*,
   5 A.2d 503 (Del. 1939) .............................................................................................19

*Hamilton v. Barnes*,
   2018 WL 4053459 (N.D. Cal. Aug. 24, 2018) ........................................................25

*In re HP Deriv. Litig.*,
   2012 WL 4468423 (N.D. Cal. Sept. 25, 2012) ........................................................24

*Huang v. Avalanche Biotechnologies, Inc.*,
   2016 WL 6524401 (N.D. Cal. Nov. 3, 2016) ..........................................................21

*Hutton v. McDaniel*,
   264 F. Supp. 3d 996 (D. Ariz. 2017) .......................................................................20

*In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012)......................................................................21

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991)..............................................................................................................3, 9

*Kelley v. Rambus, Inc.*,
    2008 WL 5170598 (N.D. Cal. Dec. 9, 2008)............................................................................23

*Krieger v. Atheros Commc'ns, Inc.*,
    2012 WL 1933559 (N.D. Cal. May 29, 2012)....................................................................21, 23

*Lane v. Page*,
    649 F. Supp. 2d 1256 (D.N.M. 2009)......................................................................................24

*Levine v. Smith*,
    591 A.2d 194 (Del. 1991)........................................................................................................10

*Levitt v. Cathcart*,
    980 F.2d 927 (3d Cir. 1992)....................................................................................................24

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
    845 A.2d 1040 (Del. 2004) .....................................................................................................11

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)...................................................................................21

*Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*,
    2016 WL 4076369 (Del. Ch. Aug. 1, 2016) .....................................................................18, 19

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)................................................................................................................23

*In re Nanthealth, Inc. S'holder Litig.*,
    2020 WL 211065 (Del. Ch. Jan. 14, 2020)..............................................................................11

*Okla. Firefighters Pension & Ret. Sys. v. Corbat*,
    2017 WL 6452240 (Del. Ch. Dec. 18, 2017)..........................................................................19

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
    774 F.3d 598 (9th Cir. 2014) ..................................................................................................21

*In re Paypal Holdings, Inc. S'holder Deriv. Litig.*,
    2018 WL 466527 (N.D. Cal. Jan. 18, 2018)...............................................................11, 21, 24

*In re Polycom, Inc.*,
    78 F. Supp. 3d 1006 (N.D. Cal. 2015) ..............................................................................12, 17

*Potter v. Hughes*,
    546 F.3d 1051 (9th Cir. 2008) ...............................................................................................9, 10

*Pub. Employees Ret. Sys. of Mississippi v. Qualcomm, Inc.*,
    773 F. App'x 987 (9th Cir. 2019)............................................................................................15

*Quinn v. Anvil Corp.*,
   620 F.3d 1005 (9th Cir. 2010) ........................................................................10

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993) .............................................................................9, 10

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...........................................................................21

*Rosenbloom v. Pyott*,
   765 F.3d 1137 (9th Cir. 2014) .......................................................................3, 10

*Schock v. Nash*,
   732 A.2d 217 (Del. 1999) ................................................................................19

*Seinfeld v. Bartz*,
   322 F.3d 693 (9th Cir. 2003) ............................................................................22

*In re Silicon Graphics Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) .........................................................................9, 10

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
   417 F. Supp. 3d 379 (S.D.N.Y 2019) ..............................................................23

*South v. Baker*,
   62 A.3d 1 (Del. Ch. 2012)......................................................................4, 12, 18

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) ................................................................................17

*In re Textron, Inc.*,
   811 F. Supp. 2d 564 (D.R.I. 2011).....................................................................11

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004) ...............................................................................20

*Towers v. Iger*,
   912 F.3d 523 (9th Cir. 2018) ..........................................................10, 12, 16, 18

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)...........................................................................................21

*In re Verisign, Inc. Deriv. Litig.*,
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ...........................................................24

*In re Walt Disney Co. Derivative Litig.*,
   906 A.2d 27 (Del. 2006) ..................................................................................12

*Wood v. Baum*,
   953 A.2d 136 (Del. 2008) ........................................................................3, 10, 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Yahoo! Inc. S'holder Deriv. Litig.*,
    153 F. Supp. 3d 1107 (N.D. Cal. 2015) ............................................................................14

**STATUTES**

15 U.S.C.
    § 78n(a) ............................................................................................................................20
    § 78u-4(b)(2)(A) ..............................................................................................................21

Cal. Corp. Code
    § 301.3 ......................................................................................................................16, 18
    § 301.4 ......................................................................................................................16, 18

Del Code tit. 8, § 174 ............................................................................................................11

**RULES**

Fed. R. Civ. P. 9(b) ...............................................................................................................20

Fed. R. Civ. P. 12(b)(6) .........................................................................................................10

Fed. R. Civ. P. 23.1 ....................................................................................................... *passim*

**REGULATIONS**

17 C.F.R. § 240.14a-9(a) ..................................................................................................8, 20

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 8, 2021, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Courtroom 8, 4th Floor, located at 280 South 1st Street, San Jose, CA 95113, Nominal Defendant Advanced Micro Devices, Inc. ("AMD," or the "Company"), through its undersigned counsel, will, and hereby does, move to dismiss Plaintiff City of Pontiac Police and Fire Retirement System's ("Plaintiff") Verified Shareholder Derivative Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure ("FRCP") 23.1.  The Complaint should be dismissed because Plaintiff failed to make a pre-suit demand on AMD's Board of Directors (the "Board"), consisting of Defendants Caldwell, Denzel, Durcan, Gregoire, Householder, Marren, Su, and Talwalkar (the "Individual Defendants," and, together with AMD, "Defendants") and does not adequately plead demand futility.  Thus, Plaintiff fails to meet a threshold pleading requirement for all three of its claims: (i) breach of fiduciary duty, (ii) unjust enrichment, or (iii) violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Defendants' motion to dismiss (the "Motion") is based on this Notice, the supporting Memorandum of Points and Authorities ("Memorandum"), the Declarations of Morgan E. Whitworth[1] and Linda Lam filed concurrently herewith, the accompanying Request for Judicial Notice, the complete files and records in this action, and any additional material and arguments as may be considered in connection with the hearing on the Motion.

## ISSUE TO BE DECIDED

Whether the Court should dismiss Plaintiff's Complaint for failure to make a pre-suit demand on the Board or to plead with particularity that such a demand would have been futile, as required by FRCP 23.1 and Delaware law.

## I.    INTRODUCTION

This is at least the eighth shareholder derivative lawsuit to have been filed against a public company over the past several months amidst the ongoing national conversation on race.  Like the others, this lawsuit rests on the general theory that AMD lacks sufficient racial diversity on its

---

[1] All references to "Ex." herein are to the exhibits to the Declaration of Morgan E. Whitworth.

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW

Board of Directors (focusing specifically on African American representation) and thus (1) the companies' public statements about their commitments to diversity and inclusion were false or misleading, (2) the companies' directors breached their fiduciary duties to the corporations and their shareholders by allegedly allowing this occur, and (3) as a result, these are the "rare" and "extraordinary" instances where a single shareholder may displace the corporation's duly elected directors and litigate claims of its choosing on behalf of the corporation.  But Plaintiff's counsel's "ready-fire-aim" approach misses the mark, and it explains why Plaintiff gets wrong basic facts about AMD's commitment to diversity and its recent performance.

AMD is one of just three companies in the Fortune 500 to be led by a woman of color, Dr. Lisa Su, who is AMD's President and CEO, and a member of AMD's board of directors.  Dr. Su is joined on the eight-member Board by one other woman and one other person of color.  AMD's executive leadership team likewise includes three women and at least seven non-white members. The crux of Plaintiff's theory is that AMD's directors and officers lied when making statements (or permitting others to make statements) like AMD "is committed to increasing the number of women and under-represented minorities in the technology industry" and "will actively identify candidates who could enhance the diversity represented on the Board." Compl. ¶ 2.  In particular, Plaintiff claims that these statements about AMD's commitment to diversity were all false because AMD does not currently have an African American serving on its Board or in the group Plaintiff defines as AMD's "senior leadership," and that AMD's shareholders were damaged as a result. But entirely missing from the Complaint is any connection between the purported omission— namely, the public fact that the AMD Board lacked an African American Board member—and the challenged statements, which highlight AMD's ongoing efforts to increase its diversity.  Plaintiff's allegations ignore the reality that diversity is measured in a number of ways—as AMD's own statements show—and also ignore the fact that AMD's diverse leadership team has delivered exceptional results for shareholders, generating some of the highest returns of any public company over the past several years.  AMD takes seriously its role in the country's dialogue about diversity and race; it fosters diversity across a range of measures (including race, ethnicity, gender, and sexual orientation) and AMD leads by example through actions that are consistent with its

statements.  This lawsuit, by contrast, is wrong on the facts, has no basis in the law, and is merely an effort to monetize an important progressive moment in our nation's history.

The Complaint fails at the start because Plaintiff has not established that it may bring this action on AMD's behalf.  Shareholder derivative suits like this one run counter to "the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of [the] shareholders." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991) (quoting *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 530 (1984)).  For that reason, FRCP 23.1 and Delaware law[2] impose significant barriers that limit a single shareholder's ability to usurp corporate litigation claims, and the overwhelming majority of these claims fail on the pleadings as a matter of law.  Plaintiff admits it did not make the required pre-suit demand that the Board pursue this litigation, claiming instead that demand would have been futile because Defendants allegedly face "substantial liability" on each claim due to their allegedly "false statements about their own and AMD's commitment to diversity."  Compl. ¶ 99.  But Delaware law demands much more of shareholders who claim that demand would have been futile—particularized, director-by-director allegations that a majority of the directors face a substantial likelihood of liability for "fraudulent," "illegal," or "bad faith conduct" and, as a result, are unable to fairly and impartially consider the demand.  *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008).  The Complaint comes nowhere close to alleging any false or misleading statement and does not satisfy the demand futility standard for any of the claims alleged.

***First,*** Plaintiff fails to plead that any director—let alone five of the eight—faces a substantial likelihood of liability for the breach of fiduciary duty or unjust enrichment claims.  Under applicable Delaware law, Plaintiff can only plead the requisite "'substantial likelihood' of personal liability" for a breach of fiduciary duties if it can allege "with particularity actual director involvement in a decision or series of decisions that violated positive law," such that the directors

---

[2] Delaware law governs this case because AMD is a Delaware corporation.  Compl. ¶ 25.  Although Rule 23.1 "supplies the pleading standard for assessing allegations of demand futility, 'the substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief'"—here, Delaware.  *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (citation omitted).

1  "knowingly" breached their fiduciary duties, or "consciously failed to act after learning about

2  evidence of illegality" through a "red flag."  *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012).  Both

3  state-law claims turn on the allegation that Defendants breached their fiduciary duties or enriched

4  themselves by making or approving materially false and misleading statements that appeared on

5  AMD's website, in its Corporate Social Responsibility Reports, and in its Proxies regarding its

6  commitment to diversity.  Compl. ¶¶ 51-58.  Yet Plaintiff fails to allege any particularized facts

7  showing that any of these statements were false or misleading in any way.  Plaintiff also asks this

8  Court to turn a blind eye to the significant diversity of AMD's leadership and to exclude countless

9  gender, racial, ethnic, and sexual orientation groups from the definition of "diversity."  Nor does

10  Plaintiff plead the required economic loss.  The Complaint does not explain how AMD has been

11  damaged nor allege any supporting facts, because AMD's diverse leadership team have delivered

12  extraordinary results for shareholders in recent years—increasing the value of AMD stock more

13  than 500% in the approximately three years since Plaintiff invested.  On these facts, Plaintiff

14  cannot show that any Defendant faces any liability—much less a substantial likelihood of

15  liability—in connection with AMD's statements about diversity.

16       ***Second,*** and for similar reasons, Plaintiff fails to plead that any director faces a substantial

17  likelihood of liability for a violation of Section 14(a) of the Exchange Act.  Plaintiff's 14(a) claim

18  challenges only the statements about AMD's commitment to diversity in its 2018 to 2020 Proxies,

19  Compl. ¶¶ 54-55, but as noted, none contained any materially false or misleading statements.  Nor

20  does Plaintiff plead, as it must, that any alleged misstatement was an "essential link" to any conduct

21  that purportedly harmed AMD.  Moreover, Plaintiff's claim with respect to a statement made in

22  the 2018 and 2019 proxies is time-barred.

23       In sum, Plaintiff fails to meet the "stringent" pleading requirements for demand futility,

24  which are designed to protect all shareholders by preventing a single shareholder from draining

25  and diverting corporate resources based on that one "stockholder's . . . pursuit of a purported

26  corporate claim based solely on conclusions, opinions or speculation."  *Brehm v. Eisner*, 746 A.2d

27  244, 255 (Del. 2000).  For all of these reasons, the entire Complaint should be dismissed with

28  prejudice.

## II.     FACTUAL BACKGROUND

### A.     AMD's Global Semiconductor Business

AMD is a global semiconductor company incorporated in Delaware with executive offices in Santa Clara, California.   Compl. ¶ 25.   AMD specializes in developing high-performance computing and graphics microprocessors and related products and services.   Ex. A at 1-7.   AMD maintains operations around the world and has more than 11,000 employees, roughly half of whom are outside the U.S.  *Id.* at 11, 16.

### B.     AMD's Commitment To Diversity

AMD has long been committed to diversity and inclusion, recently reiterating that it "is committed to increasing the number of women and under-represented minorities in the technology industry."   Compl. ¶¶ 2, 5; Ex. B at 2.   The Company is led by two first-generation Americans.  *See* Ex. C; Ex. D.  Dr. Lisa T. Su, who was born in Taiwan and named AMD's President and CEO in 2014, is recognized as one of the world's most successful business leaders.   Ex. E at 10; Ex. F. She is also one of just *three* women of color to lead a Fortune 500 company.   Ex. G.  AMD's Chief Financial Officer and Treasurer, Devinder Kumar, was born and educated in Malaysia.   Compl. ¶ 83; Ex. D.  At all times relevant to this lawsuit, AMD's Board, which currently has eight members, has included two women (Dr. Su and Nora Denzel) and either two or three persons of color (Dr. Su, Mr. Talwalkar, and Mr. Yahia, who retired from the board in 2019).   AMD's senior management (as Plaintiff defines it, Compl. ¶ 7) includes three women and seven non-white executives.[3]  *See* Declaration of Linda Lam, submitted concurrently herewith ("Lam Decl.").

This diversity is no accident.   The charter of the Board's Nominating and Governance Committee explains the "great value in diversity of experience and perspective, including but not limited to diversity in gender, race, culture, nationality, background, age and professional experience."   Compl. ¶ 67.  As a result, that committee works to "actively identify candidates who could enhance the diversity represented on the Board."  *Id.*; *see also* Ex. E at 17 ("Although we do

---

[3] AMD's leadership team consists of Dr. Lisa Su, Devinder Kumar, Mark Papermaster, Rick Bergman, Ruth Cotter, Robert Gama, Darren Grasby, Keivan Keshvari, Dan McNamara, Saeid Moshkelani, Forrest Norrod, Spencer Pan, Jane Roney, David Wang, Harry Wolin, Nazar Zaidi, and Andrej Zdravkovic.  *See* https://www.amd.com/en/corporate/leadership.

not have a formal diversity policy, to foster and maintain a diversity of viewpoints, backgrounds and experience on the Board, the Nominating and Corporate Governance Committee . . . assesses nominees and potential candidates . . . taking into consideration the diverse communities and geographies in which we operate.").

AMD also actively sponsors a number of internal and external initiatives to strengthen and promote diversity and inclusion at all levels.  Ex. B at 29-31; Compl. ¶¶ 2 n.1, 5.  For example, the Company sponsors at least ten different employee resource groups, including the African American Forum (focused on empowering African American employees at AMD through professional development, career management, and mentoring); the Women's Forum (focused on recruiting, retaining, and promoting women at AMD); AMD Impacto (focused on the AMD Latinx community); and AMD Pride (focused on promoting an inclusive workplace, regardless of sexual orientation or gender identity).  Ex. B at 30.  Looking to the next generation, AMD has worked to build a diverse talent pipeline for the technology industry by creating the AMD Community Corps in which current AMD employees volunteer their time with community organizations to promote STEM education.  Ex. B at 46 (discussing programs in London, Sao Paulo, and Calgary and with an Austin, TX organization focused on first-generation students).  The Company has also partnered with local organizations to create "Learning Labs" where students can learn foundational computer science literacy and coding skills.  Ex. B at 42; Ex. S (noting partnerships with the Boys and Girls Clubs of Silicon Valley, the Ann Richards School for Young Women Leaders, the Visions of Science Network for Learning, and the Shanghai Blind School).

In response to a 2020 survey in which 97% of AMD employees participated, 85% responded that they were "proud of [AMD's] involvement in the community and social causes."  Ex. B at 29-30.  That said, the Company recognizes that its commitment to increasing diversity is a continuous process, and has said that it is "constantly striving to improve our gender and diversity numbers."  *Id.* at 31; Compl. ¶ 5.  Indeed, as noted on the very website on which Plaintiff relies for its allegations, AMD has been recognized for its commitment to diversity and inclusion by reputable organizations such as *Bloomberg*'s Gender-Equality Index, the Human Rights Campaign

100% Corporate Equality Index for being a Best Place to Work for LGBTQ Equality, and *Forbes* as one of America's Most Just Companies.  Ex. R; Compl. ¶¶ 5, 48, 52, 93, 100.

### C.    AMD's Financial Success Under The Current Leadership Team

Plaintiff alleges that it acquired its shares of AMD stock in July 2017.  Compl. ¶ 24.  In the slightly more than three years between when Plaintiff became an AMD shareholder and when it filed this lawsuit on September 29, 2020, AMD's stock price *increased by more than 500%*.  Ex. H.  These gains are part of a larger trend that has occurred under Dr. Su's leadership—AMD's stock price has increased by almost *2400%* from when Dr. Su became CEO on October 8, 2014 (closing price: $3.28), until Plaintiff filed this lawsuit on September 29, 2020 (closing price: $81.77).  Exs. I, H.  Indeed, during 2018 and 2019, AMD was the *best performing stock in the entire S&P 500 index*.  Exs. J, K.  AMD's stock price growth reflects the growth of its bottom line: the Company's net income in 2019 was $744 million higher than it was in 2014 (increasing from a *loss* of $403 million in 2014 to $341 million in 2019).  Ex. L at 39; Ex. A at 33.

### D.    Plaintiff Files This Lawsuit

On September 29, 2020, Plaintiff filed this lawsuit purporting to assert claims on AMD's behalf against the Individual Defendants for breach of fiduciary duty, unjust enrichment, and violation of Section 14(a) of the Exchange Act.  Compl. ¶¶ 103-16.  Plaintiff alleges that, as a result of the Individual Defendants' alleged misrepresentations, AMD suffered unspecified damages.  *Id.* ¶¶ 98, 108, 113.  Plaintiff names as Individual Defendants the eight members of the Board at the time this lawsuit was filed: Defendants Caldwell, Denzel, Durcan, Gregoire, Householder, Marren, Su, and Talwalkar.  *Id.* ¶¶ 26-33; Ex. E at 7.

The lawsuit focuses on eleven statements AMD made regarding diversity on its website, in its Corporate Responsibility Reports, and in the proxy statements AMD filed with the U.S. Securities and Exchange Commission ("SEC") for 2018, 2019, and 2020.[4]  Compl. ¶¶ 112; *id.* ¶¶

---

[4] AMD filed its 2018 proxy statement on March 19, 2018 (the "2018 Proxy"), Ex. M; its 2019 proxy statement on March 21, 2019 (the "2019 Proxy"), Ex. N; and its 2020 proxy statement on March 26, 2020 (the "2020 Proxy"), Ex. E.  Collectively, the 2018, 2019, and 2020 Proxies will be referred to as the "Proxies."  A proxy statement is a statement notifying stockholders of items subject to stockholder vote at the Company's annual meeting.

52-58.[5]   The Proxies contain recommendations from the Company's directors concerning the election of the Company's director-nominees, ratification of the Company's independent auditor, and an advisory vote on executive compensation.  Ex. M at 7; Ex. N at 7; Ex. E at 7, 9.  The Proxies also highlight AMD's corporate governance values, including its commitment to diversity.  Compl. ¶¶ 54, 55, 60, 61, 64, 81; Ex. M at 19; Ex. N at 19; Ex. E at 17, 18, 36.

Plaintiff asserts three claims: violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 (Count I), breach of fiduciary duty (Count II), and unjust enrichment (Count III), all of which are based entirely on Plaintiff's contention that Defendants misrepresented AMD's commitment to diversity.  Count I is based on Plaintiff's allegation that the Proxies "omitted material facts, including the fact that Defendants were causing AMD to publicly claim support for diversity and inclusion across the Company's enterprise."  Compl. ¶ 105.  Counts II and III allege Defendants "caused the Company to disseminate to AMD shareholders materially misleading and inaccurate information through" the Proxies, AMD's website, and its annual Corporate Responsibility Reports about AMD's commitment to diversity.  Compl. ¶ 112.

## III.   PLAINTIFF CANNOT MAINTAIN THIS ACTION ON BEHALF OF AMD

Plaintiff did not make the pre-suit demand required by FRCP 23.1 prior to commencing this lawsuit on behalf of AMD.  Plaintiff also did not—and cannot—plead that making such demand would have been futile.  Plaintiff's Complaint devotes only a handful of paragraphs to its claim that pre-suit demand would have been futile.  Compl. ¶¶ 14-19; 99-101.  Missing from the Complaint are any particularized allegations on any of the components necessary to show demand futility—*i.e.*, (1) actual knowledge of illegal conduct; (2) on a director-by-director basis; (3) by a majority of the Board.  Instead, Plaintiff merely alleges the importance of diversity, ignores AMD's substantial and manifested commitment to diversity, and declares that the Individual Defendants as a group are liable for the purportedly "false statements about their own and AMD's commitment to diversity," which they allegedly "caused the Company to disseminate to AMD shareholders" through the Proxies, AMD's website, and its annual Corporate Responsibility Report.  Compl. ¶ 112; *id.* ¶¶ 52-58.

---

[5] The statements Plaintiff challenges in the Complaint are listed in Appendix A to this Motion.

1

    **A.**    **Legal Standard for Demand Futility**

2

        1.    <u>Delaware Law Imposes a Heavy Pleading Burden When a Single Shareholder Seeks to Take Control of Corporate Litigation</u>

3

4    "[T]he general rule of American law is that the board of directors controls a corporation.

5  Accordingly, strict compliance with [FRCP] 23.1 and the applicable substantive law is necessary

6  before a derivative suit can wrest control of an issue from the board of directors." *Potter v. Hughes*,

7  546 F.3d 1051, 1058 (9th Cir. 2008).   Rule 23.1 provides, in relevant part, that a shareholder

8  derivative complaint must "state with particularity any effort by the plaintiff to obtain the desired

9  action from the directors . . . and the reasons for not obtaining the action or not making the effort."

10  Fed. R. Civ. P. 23.1(b)(3).   Whether allegations meet the requirements of Rule 23.1 is determined

11  by the laws of the company's state of incorporation.   *See In re Silicon Graphics Sec. Litig.*, 183

12  F.3d 970, 990 (9th Cir. 1999), *superseded by statute on other grounds as stated in Burbrink v.*

13  *Campbell*, 734 F. App'x 416 (9th Cir. 2018).   AMD is incorporated in Delaware.   Compl. ¶ 25.

14  Under Delaware law, "the right of a stockholder to prosecute a derivative suit is limited to

15  situations where the stockholder has demanded that the directors pursue the corporate claim and

16  they have wrongfully refused to do so or where demand is excused because the directors are

17  incapable of making an impartial decision regarding such litigation." *In re Accuray, Inc. S'holder*

18  *Deriv. Litig.*, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010) (quoting *Rales v. Blasband*, 634 A.2d

19  927, 932 (Del. 1993)).   This demand requirement is rooted in "the basic principle of corporate

20  governance that the decisions of a corporation—including the decision to initiate litigation—

21  should be made by the board of directors." *Kamen*, 500 U.S. at 101 (citation omitted).   A complaint

22  that does not meet these requirements must be dismissed.   *See Brehm*, 746 A.2d at 267.

23

        2.    <u>Pre-Suit Demand Is Only Futile In The "Rare" and "Egregious" Cases Where Directors Face a "Substantial Likelihood" Of Personal Liability In the Potential Suit</u>

24

25    To plead demand futility, Plaintiff must "allege particularized facts that 'create a

26  reasonable doubt that . . . the board of directors could have properly exercised its independent and

27  disinterested business judgment in responding to a demand.'" *In re Citigroup Inc. S'holder Deriv.*

28  *Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (quoting *Rales*, 634 A.2d at 934).   Here, Plaintiff does

1    not claim that any director lacked "independence" with respect to any matter alleged in this lawsuit.

2    Therefore, only the "interestedness" prong of this analysis is relevant, meaning Plaintiff must show

3    that at least five of the eight directors serving as of the date Plaintiff filed the complaint were

4    interested.  A director is only interested in those "rare cases" where his or her actions were "so

5    egregious [that] . . . a substantial likelihood of director liability . . . exists." *Aronson v. Lewis*, 473

6    A.2d 805, 815 (Del. 1984) (*overruled on other grounds* by *Brehm,* 746 A.2d at 244))*; Towers v.*

7    *Iger*, 912 F.3d 523, 529 (9th Cir. 2018).   A "mere threat" of liability is insufficient.  *Silicon*

8    *Graphics*, 183 F.3d at 990.[6]

9              3.    FRCP 23.1's Pleading Standard Is Far More Demanding Than FRCP 12's

10   The Delaware Supreme Court has explained that the "substantial likelihood of personal

11   liability" standard places a "heavy burden" on plaintiffs alleging demand futility—one that is

12   "more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss." *Levine v. Smith*,

13   591 A.2d 194, 207 (Del. 1991), *overruled in part on other grounds by Brehm*, 746 A.2d at 253.

14   "Because of the extraordinary nature of a shareholder derivative suit, Rule 23.1 establishes

15   stringent conditions for bringing such a suit" and requires "'strict compliance . . . before a

16   derivative suit can wrest control of an issue from the board of directors.'"  *Quinn v. Anvil Corp.*,

17   620 F.3d 1005, 1012 (9th Cir. 2010) (quoting *Potter*, 546 F.3d at 1058).  In short, "the bar is high,

18   the standards are stringent, and the situations where demand will be excused are rare."  *Canty v.*

19   *Day*, 13 F. Supp. 3d 333, 345 (S.D.N.Y. 2014) (internal citation omitted).   "'[C]onclusory

20   allegations are not considered.'"  *Rosenbloom*, 765 F.3d at 1148 (quoting *Brehm*, 746 A.2d at 255).

21   And "inferences that are not objectively reasonable cannot be drawn in the plaintiff's favor."

22   *Wood*, 953 A.2d at 140 (citation omitted).  The inquiry focuses on the capability of the existing

23   Board "at the time of the filing of the [] complaint" to consider a pre-suit demand, *Bhonagiri v.*

24   *Pandey*, 2020 WL 5893404, at *2 (N.D. Cal. Oct. 5, 2020), and Plaintiff must allege facts specific

25   _____

26   [6] Plaintiff suggests that the business judgment rule does not apply here because it is "a form of
     privilege."   Compl. ¶ 100.   That rhetoric is, not surprisingly, unsupported and unexplained.
27   Regardless, it is irrelevant because Plaintiff does not allege any particular transaction or Board
     decision to which the business judgment rule might apply.  *Rales*, 634 A.2d at 933 ("Where there
28   is no conscious decision by directors to act or refrain from acting, the business judgment rule has
     no application.").

to *each* director, *In re Paypal Holdings, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *5 (N.D. Cal. Jan. 18, 2018).

### B. Plaintiff Fails To Plead A Substantial Likelihood Of Personal Liability For Breach Of Fiduciary Duty Or Unjust Enrichment

Here, Plaintiff has not pled that any director faces liability at all, much less the substantial likelihood of personal liability that would have rendered pre-suit demand futile.  Under Delaware law, "directors are entitled to a presumption that they were faithful to their fiduciary duties . . . . [and] the burden is upon the plaintiff in a derivative action to overcome that presumption . . . . [by] alleg[ing] particularized facts creating a reasonable doubt of a director's [breach] to rebut the presumption at the pleading stage."  *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004).[7]  Plaintiff's Complaint does no such thing.

#### 1. AMD's Articles of Incorporation Strictly Limit Its Directors' Liability

As an initial matter, the exculpatory provision in AMD's Amended and Restated Certificate of Incorporation limits the circumstances in which directors can be liable to the Company for a breach of fiduciary duty.  The Amended and Restated Certificate of Incorporation provides that:

> A director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

*See* Ex. O at 3.  In other words, AMD's directors face no personal liability for negligent or nonintentional breaches of their duty of care.  This type of clause, which is "appropriately considered at the pleading stage in assessing demand futility," requires Plaintiff to "plead with particularity [a] 'substantial likelihood that [the Board Members'] conduct falls outside the

---

[7] Plaintiff's cause of action for unjust enrichment is duplicative of its fiduciary duty claims and does not independently give rise to a "substantial likelihood" of liability.  *Gamco Asset Mgmt., Inc. v. iHeartMedia, Inc.*, 2016 WL 6892802, at *19 (Del. Ch. Nov. 29, 2016) (dismissing "duplicative" unjust enrichment claims).  Plaintiff contends that the Individual Defendants were "enriched" through their compensation as officers and directors, Compl. ¶¶ 26-33, but does not plead anything as to how the Board's compensation is tied to any allegedly improper conduct.  Thus, the unjust enrichment claim fails for the same reasons as Plaintiff's fiduciary duty claim. *See In re Nanthealth, Inc. S'holder Litig.*, 2020 WL 211065, at *8 (Del. Ch. Jan. 14, 2020); *see also In re Textron, Inc.*, 811 F. Supp. 2d 564, 578 (D.R.I. 2011).

exemption.'" *In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1013-14 (N.D. Cal. 2015) (quoting *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995)).  Thus, Plaintiff can only plead the requisite "'substantial likelihood' of personal liability" if it can allege "with particularity actual director involvement in a decision or series of decisions that violated positive law" or an egregious failure of oversight, such that the directors "knowingly" breached their fiduciary duties or "consciously failed to act after learning about evidence of illegality" through a "red flag." *South*, 62 A.3d at 15; *see also In re Autodesk, Inc., S'holder Deriv. Litig.*, 2008 WL 5234264, at *9-10 (N.D. Cal. Dec. 15, 2008) (where corporation "has adopted an exculpatory provision under Delaware [law]… liability is foreclosed for all but the most egregious breaches of duty—self-dealing [ ] and intentional bad faith"); *City of Birmingham Ret. and Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017); *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (holding that breach of duty of loyalty requires "intentionally act[ing] with a purpose other than that of advancing the best interests of the corporation . . . act[ing] with the intent to violate applicable positive law . . . [or] intentionally fail[ing] to act in the face of a known duty to act, demonstrating a conscious disregard for their responsibilities").

> 2.   The Complaint Is Devoid Of Any Particularized Allegations Regarding Any Director's Conduct Or Actions

In addition, the Complaint pleads nothing about what any particular director purportedly did to incur the substantial likelihood of personal liability that renders him or her unable to fairly and impartially consider a demand to bring Plaintiff's claims.  To survive dismissal, Plaintiff must "plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Towers*, 912 F.3d at 529 (emphasis in original) (quoting *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007)). Instead, Plaintiff levies generalized allegations against the board as a whole, but even those generic allegations do not explain why any director or group of directors purportedly faces a substantial likelihood of liability, providing an independent ground for dismissal.

*First,* Plaintiff argues that pre-suit demand is futile because acting on a demand, in essence, would require the Board to sue some or all of its members.  *See* Compl. ¶ 18.  But that assumes—

rather than answers—the question of whether any director has a substantial likelihood of personal liability in the proposed suit.  Merely naming a director as a defendant does not create any liability, much less a substantial likelihood of liability, and courts routinely reject this contrived combination of purported liability and demand futility.  *Aronson*, 473 A.2d at 818 (noting a bare claim that the directors would have to sue themselves does not raise a legally cognizable claim under Delaware corporate law); *see also Arduini v. Hart*, 774 F.3d 622, 632 (9th Cir. 2014).  Similarly, Plaintiff asserts that pre-suit demand would have been futile because rejecting a demand could cause "the public [to] view the [Individual Defendants'] previous statements supporting diversity as disingenuous" or the Individual Defendants to be "perceived by the public as hostile to African Americans" and "socially shunned."  Compl. ¶ 18.  But it is not sufficient to allege that the Defendants' reputations could suffer if they accepted or rejected Plaintiff's demand, because "reputational risk exists in any business decision" and this does not create a substantial likelihood of liability or any other basis to excuse pre-suit demand.  *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *20 (Del. Ch. Oct. 12, 2011).  In essence, Plaintiff appears to be arguing that any time a director faces an uncomfortable choice, demand would be futile regardless of whether there is a substantial likelihood of liability.  This is not the law.  Demand futility "cannot be taken to mean that any board approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors, or some other form of sterilizing influence upon them.  Were that so, the demand requirements of our law would be meaningless, leaving the clear mandate of [] Rule 23.1 devoid of its purpose and substance."  *Aronson*, 473 A.2d at 814.

*Second*, the fact that certain directors served on two committees of AMD's Board does nothing to create a substantial likelihood of liability for those directors.  Plaintiff alleges that Defendants Denzel, Durcan and Talwalkar played a "role in keeping African Americans off the Board" by virtue of their service on AMD's Compensation and Leadership Resources Committee, Compl. ¶¶ 62-64, and Defendants Caldwell, Denzel, Durcan, Gregoire, Householder, Marren and Talwalkar performed the same "role" by virtue of their service on the Nominating and Corporate Governance Committee, *id.* ¶¶ 65-72.  As an initial matter, Plaintiff has not offered a single fact suggesting that any of these seven individuals ever did anything to "keep[] African Americans off

the Board."  The Nominating and Corporate Governance Committee Charter states that the committee recognizes "the great value in diversity" and "will actively identify candidates who could enhance the diversity represented on the Board."  Compl. ¶ 67.  The Complaint does not (because it cannot) allege that the committee failed to do this, and the fact that AMD has diverse Board members shows that the Committee did, in fact, consider diversity in making its nominations.  Moreover, the Complaint does nothing to connect any of these directors' Board committee service to any of the alleged misstatements; it contains no factual allegations that any of these directors prepared, reviewed, or approved of the specific statements Plaintiff challenges from AMD's website or in the annual Corporate Responsibility reports.  Compl. ¶¶ 52-53, 56-58. *See In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947, 963 (N.D. Cal. 2007) ("Mere membership on a committee or board, without specific allegations as to defendants' roles and conduct, is insufficient to support a finding that directors were conflicted."); *see also In re Yahoo! Inc. S'holder Deriv. Litig.*, 153 F. Supp. 3d 1107, 1123 (N.D. Cal. 2015) (same); *Wood*, 953 A.2d at 142-43.

> 3.    There Are No Particularized Factual Allegations Suggesting That AMD's Statements About Its Commitment To Diversity Were False

The crux of Plaintiff's claim is that the entire Board faces a substantial likelihood of personal liability "because Defendants voluntarily chose to make, and caused the Company to make, false positive statements about diversity and their effort to achieve a diverse board of directors."  Compl. ¶ 19.  This claim fails for several reasons.

*First,* from AMD's Proxies, website, and annual Corporate Responsibility reports, Plaintiff challenges eleven aspirational statements about AMD's commitment to diversity without ever pleading any facts suggesting any of them are false or misleading.  *See* Compl. ¶¶ 52-58.  These statements (i) describe how AMD is undertaking efforts to "increase the number of women and under-represented minorities in the technology industry," "growing a diverse, inclusive workforce," "constantly striving to improve [its] gender and diversity numbers through specific programs," and "continu[ing] [its] efforts to recruit diverse talent," *id.* ¶ 52; (ii) articulate AMD's values, *id.* ¶¶ 53, 58 (recognizing that diversity "makes AMD stronger"); (iii) explain that AMD's

Board considers "the diverse communities and geographies in which [AMD] operate[s]," *id.* ¶¶ 54-55; and (iv) identify pro-diversity policies that AMD has adopted: making "donations to high-impact non-profits focused on social and racial equality and support for their empowerment scholarship and mentorship programs" and "review[ing] annually our Diversity, Belonging, and Inclusion strategies and metrics with members of the AMD Board of Directors," *id.* ¶ 57.

Plaintiff does not allege facts inconsistent with *any* of these eleven statements, which highlight AMD's efforts to achieve greater diversity. Contrary to Plaintiff's assertion, these statements do not purport to claim that AMD has already "achieve[d] diversity across its enterprise," Compl. ¶ 51, and is now resting on its successes. To the contrary, the very sources Plaintiff relies on in the Complaint show that AMD *continues to strive* to increase diversity through its employee resource groups and its efforts to build a diverse talent pipeline for the technology industry by promoting STEM education in underserved communities. *See supra* Section II.B. Absent an allegation that AMD has fabricated these efforts and programs—which Plaintiff rightfully does not, and could not, make consistent with its obligations under the Rules—Plaintiff simply has not and cannot allege that any of AMD's aspirational statements about its ongoing efforts were false. *Pub. Employees Ret. Sys. of Mississippi v. Qualcomm, Inc.*, 773 F. App'x 987, 988 (9th Cir. 2019).

*Second*, Plaintiff argues that all eleven statements were misleading solely because AMD does not currently have an African American on its Board or executive leadership team. *Id.* ¶ 59.[8] Again, however, nothing in any of AMD's statements suggested that to be the case—and, in any event, no one was misled about this fact because the racial composition of AMD's leadership is a publicly available fact, as Plaintiff's own allegations make clear. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006-07 (9th Cir. 2002) (holding that a statement is actionable only if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists").

*Third,* Plaintiff's argument also depends entirely on an effort to rewrite AMD's statements and exclude everyone other than African Americans from the definition of "diversity." This effort

---

[8] *See also id.* ¶¶ 2, 6, 8, 12, 61, 76, 78, 90, 93, 94.

finds no support in the law or common sense.  The sources relied on throughout the Complaint make clear that diversity is measured on a number of planes, including "race and ethnicity and sexual orientation as well as gender," and that racial diversity in particular is defined as all "non-white" persons, not just African Americans as Plaintiff now alleges. Ex. P at 2, 5 (cited in Compl. at ¶¶ 3, 43).  Likewise, the Nasdaq Stock Market recently published a new rule requiring Nasdaq-listed companies (like AMD) to have "at least two diverse directors," which Nasdaq defines as having at least one director "who self-identifies as female" and one director "who self-identifies as" "Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander or Two or More Races or Ethnicities," or as "LGBTQ+."  Ex. Q at 1, n.1.  The California Legislature also recently passed similar requirements, defining diversity the same way. *See, e.g.* Cal. Corp. Code §§ 301.3 & 301.4.  There is considerable racial, ethnic, and gender diversity on AMD's Board and executive team, and AMD is one of just three companies in the Fortune 500 to be led by a woman of color. *See supra* Section II.B.  Of course, AMD is "constantly striving to improve [its] gender and diversity numbers through specific programs, as is the case across the technology sector," and has recognized that it must "continue [its] efforts to recruit diverse talent and foster an inclusive and innovative culture."  Compl. ¶ 52. But the question in this lawsuit is whether AMD's directors knew the Company was lying when it said it is "striving to improve [its] gender and diversity numbers." *Id.*  There is nothing inconsistent with striving to diversify the workforce and considering diverse backgrounds of Board candidates and the lack of an African American on the Board.  And no matter how genuinely Plaintiff might subjectively believe in the narrower definition of the term "diversity" that it proffers in this lawsuit, Plaintiff simply cannot re-write AMD's disclosures, the sources cited in Plaintiff's own complaint, the laws of the state of California, or the rules of the stock exchange on which AMD is listed to create the appearance that AMD misled anyone about its commitment to diversity.  Plaintiff's common law claims are doomed by the threshold flaw that the Complaint does not plead the existence of any illegal conduct or actionable misstatements. *Towers*, 912 F.3d at 529 ("Plaintiff must plead bad faith 'by alleging with particularity that a director knowingly violated a fiduciary

1    duty or failed to act in violation of a known duty to act, demonstrating a conscious disregard for

2    her duties.'") (citation omitted).

3              4.        Plaintiff Cannot Plead A Failure Of Director Oversight

4              Unable to plead with particularity any action that any director took in violation of his or

5    her fiduciary duties, Plaintiff alleges that the Individual Defendants face a substantial likelihood

6    of personal liability because the entire Board allegedly failed to fulfill their fiduciary "duty of

7    oversight" by permitting AMD to represent that it is "a company that effectively promotes

8    diversity throughout its ranks" while not "embrac[ing] racial diversity throughout AMD's

9    corporate enterprise." Compl. ¶¶ 2, 4, 111. This sort of claim is known as a "*Caremark* claim"

10   and Delaware courts have observed that it is "possibly the most difficult theory in corporation law

11   upon which a plaintiff might hope to win a judgment." *Good*, 177 A.3d at 55 (quoting *In re

12   Caremark Int'l., Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)). Under *Caremark*,

13   directors do not face a substantial likelihood of personal liability to the corporation for a loss unless

14   "(a) the directors utterly failed to implement any reporting or information system or controls; *or*

15   (b) having implemented such a system of controls, consciously failed to monitor or oversee its

16   operations thus disabling themselves from being informed of risks or problems requiring their

17   attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Plaintiff's cookie-cutter Complaint

18   pleads neither.

19              a.        *Defendants Maintained Appropriate Controls*

20             Plaintiff does not satisfy the first *Caremark* prong because it admits that AMD had internal

21   diversity and inclusion policies, as well as financial controls, throughout the relevant period. As

22   Plaintiff acknowledges, AMD maintains a Nominating and Corporate Governance Committee

23   whose policy is to "tak[e] into consideration the diverse communities and geographies in which

24   [AMD] operate[s]," and assesses "candidates and their development plans . . . with considerations

25   for alignment not only with required skills but also with [the Company's] culture and emphasis on

26   diversity and inclusion." Compl. ¶¶ 54-55. These are precisely the sort of policies and systems

27   courts have pointed to in rejecting *Caremark* claims. *See, e.g.*, *In re Polycom,* 78 F. Supp. 3d at

28

1  1015 (rejecting allegations of "inadequate" oversight where complaint conceded "existence of

2  [the] Audit Committee, the Committee's duties, and . . . Code of Business Ethics and Conduct").

3                    *b.     Plaintiff Cannot Plead "Red Flags"*

4        Plaintiff fares no better on the second *Caremark* prong, which requires facts showing that

5  the Individual Defendants "(1) knew or should have known that the corporation was violating the

6  law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and

7  (3) that such failure resulted in damage to the corporation." *Melbourne Mun. Firefighters' Pension*

8  *Trust Fund v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016); *see also Towers*, 912 F.3d

9  at 532 (noting that plaintiff must allege facts demonstrating "red flag[s] of illegality," that is, that

10  the "Board knew of and did nothing about illegal activity").

11        Stripped of its unfounded and conclusory allegations, the Complaint points only to the fact

12  that AMD does not have any African Americans on its Board or senior leadership team.  Compl.

13  ¶ 19.  Plaintiff offers this allegation as its own "red flag," but ignores that "evidence of *illegality*

14  is the 'proverbial red flag,'" *South*, 62 A.3d at 15, and the Complaint offers no evidence of any

15  illegality.  Plaintiff has not pled—and cannot plead—that any of AMD's statements about its

16  commitment to diversity were false. *See supra* Section III.B.3.  Nor can Plaintiff identify any

17  illegal conduct with respect to the demographic composition of AMD's Board or senior leadership.

18  To the contrary, AMD complies with—indeed, exceeds—applicable law in this area.  Delaware

19  law imposes no such requirements, and AMD has exceeded the requirements of two recently

20  enacted California laws regulating board composition.  *See* Cal. Corp. Code §§ 301.3, 301.4

21  (requiring one female director by 12/31/2019 and one minority director by 12/31/21).  No law or

22  regulation requires AMD to have a certain number of Board members (or employees or leadership

23  positions generally) from any particular racial or ethnic background.  Thus, the racial makeup of

24  AMD's Board and executive team are not "red flags" of illegal misconduct. *See Melbourne*, 2016

25  WL 4076369, at *11-12 (finding no red flags where plaintiff failed to allege directors knowingly

26  failed to prevent illegal conduct).

27

28

LATHAM&WATKINS  LLP
ATTORNEYS AT LAW          18          DEFENDANTS' MOTION TO DISMISS
CASE NO. 5:20-cv-06794-LHK

1

5.   <u>Plaintiff Cannot Plead Any Loss</u>

2   Plaintiff's common law claims require it to plead a discernable loss to the Company.  The

3   duty of loyalty is breached where a director fails "to protect the interests of the corporation" or "to

4   refrain from doing anything that would work injury to the corporation, or to deprive it of profit or

5   advantage."  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (quoting *Guth v.*

6   *Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).[9]  And unjust enrichment requires, *inter alia*, "the unjust

7   retention of a benefit to the loss of another, or the retention of money or property of another."

8   *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (citation omitted).  Plaintiff does not (and cannot)

9   come anywhere close to making such allegations.  Instead, it offers generic *non-sequiturs* that say

10   nothing about AMD at all.  For example, Plaintiff alleges the directors "den[ied] AMD the

11   substantial increases in shareholder value enjoyed by companies with greater board diversity."

12   Compl ¶ 88.  Yet AMD's stock price has increased by ***500%*** in the 38 months between when

13   Plaintiff became a shareholder of AMD in July 2017 and when it filed the Complaint and by almost

14   ***2400%*** since Dr. Su became CEO on October 8, 2014.  Ex. H.  During each of the last two years,

15   AMD's stock price has increased more than any other company in the S&P 500.  *See supra* Section

16   II.C.  While Plaintiff's cut-and-paste allegation might work for other companies, it rings hollow

17   for AMD.

18   Similarly, the Complaint alleges that a "company" could be exposed to large fines, but then

19   describes how *Facebook* (not AMD) was accused of housing discrimination by the U.S.

20   Department of Housing and Urban Development because of its ad-targeting technology.  Compl

21   ¶ 88.  AMD designs and sells microprocessors (not housing or advertising) and has not been

22   accused of engaging in any of this sort of conduct.  Likewise, Plaintiff cites a consulting firm's

23   study of 366 public companies (with no indication of whether or not AMD was included)

24   suggesting that companies with "the most ethnically/culturally diverse Boards worldwide are 43%

25

26   [9] To plead a *Caremark* claim specifically, Plaintiff must also show that the Directors' alleged breaches of fiduciary duties "proximately resulted in the losses complained of."  *Caremark*, 698 A.2d at 971; *see also Melbourne*, 2016 WL 4076369, at *8; *Okla. Firefighters Pension & Ret. Sys.*

27   *v. Corbat*, 2017 WL 6452240, at *20 (Del. Ch. Dec. 18, 2017) (holding that "the board's bad faith, 'conscious inaction,'" must have "proximately caused the [complained of corporate] trauma"); *Citigroup*, 964 A.2d at 129 (noting that alleged red flags must put directors "on a heightened alert"

28   to the problems that subsequently cause damage to the corporation).

DEFENDANTS' MOTION TO DISMISS
CASE NO. 5:20-cv-06794-LHK

more likely to experience higher profits."  Compl. ¶¶ 43-48, 98.  However, since Dr. Su and Mr. Kumar took over as AMD's CEO and CFO, respectively, AMD's net income has increased more than $700 million, swinging from a loss in 2014 to a net profit of more than $341 million in 2019. Although the Complaint repeatedly alleges that AMD has been damaged, Plaintiff offers only generic hypotheticals and studiously avoids making any allegations specific to AMD to support the existence of an actionable loss—which is unsurprising because there is none.

### C.   Plaintiff Fails To Plead A Substantial Likelihood Of Personal Liability For Violation Of Section 14(a) Of The Exchange Act

Plaintiff also fails to plead that a majority of AMD's Board faces a substantial likelihood of liability under Section 14(a) of the Exchange Act.  The "heavy burden" and "stringent" standards of FRCP 23.1 and its requirement to plead particularized allegations specific to *each* director, *see supra* Section III.A, apply equally to Plaintiff's Section 14(a) claim as to its Delaware common law claims, *see Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004); *Hutton v. McDaniel*, 264 F. Supp. 3d 996, 1016 n.9 (D. Ariz. 2017); *CNET Networks*, 483 F. Supp. 2d at 966.

To state a claim under Section 14(a), a plaintiff must allege that a proxy statement contained a material misrepresentation or omitted a material fact necessary to make the statements in the proxy not false or misleading.  15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9(a).  The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires Plaintiff to specify "(1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed."  *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000) (dismissing Section 14(a) claims).  And when, as here, a plaintiff's federal securities claim sounds in fraud, the heightened pleading standards of Rule 9(b) also apply. *Id.* at 1022-23.[10]  The complaint must include specific facts giving rise to a "strong inference that

---

[10] Plaintiff alleges the Individual Defendants made "*knowingly false*" statements in AMD's annual proxy statements because AMD "either has no intention of actually nominating" "racially diverse candidates" to the Board or "is engaged in an effort to thwart the nomination of such persons." *E.g.*, Compl. ¶¶ 59-61.  Because Plaintiff alleges a single course of conduct "grounded in alleged fraudulent conduct," the Complaint must meet the more demanding pleading standards of Rule 9(b) and the PSLRA "even if [plaintiff] disclaim[s] reliance on a fraud theory."  *In re Columbia*

1   the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see In re*

2   *McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000).  Finally, Plaintiff

3   must plead particularized facts demonstrating that the allegedly false or misleading portion of the

4   proxy statement directly authorized and caused the corporate action that led to the harm alleged.

5   *See Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014); *In re Paypal*,

6   2018 WL 466527, at *4.  To survive dismissal, Plaintiff must plead more than the "mere threat"

7   of liability on these claims; Plaintiff must plead a "substantial likelihood" of personal liability,

8   raising the already high bar that applies to claims under Section 14(a).  The Complaint fails to

9   meet this high standard.

10                    1.    Plaintiff Fails To Allege A Material Misstatement Or Omission

11           Plaintiff's Section 14(a) claim fails at the first element because Plaintiff has not identified

12   a materially false statement.  To allege a false or misleading statement, Plaintiff must plead, with

13   particularity, each alleged misstatement and the reason why it was false or misleading.  *Golub v.*

14   *Gigamon Inc.*, 2019 WL 4168948, at *5 (N.D. Cal. Sept. 3, 2019).  Vague allegations followed by

15   generalized explanations are insufficient.  *In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*,

16   859 F. Supp. 2d 572, 578 (S.D.N.Y. 2012).   And a statement is material only if "there is a

17   substantial likelihood that a reasonable shareholder would consider it important in deciding how

18   to vote."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

19           ***AMD Board & Executive Diversity.***  Plaintiff targets only aspirational statements: that

20   AMD seeks to "foster and maintain a diversity of viewpoints, backgrounds and experience on the

21   Board," "tak[es] into consideration the diverse communities and geographies in which [AMD]

22   operate[s]," and assesses "candidates and their development plans . . . with considerations for

23   alignment not only with required skills but also with [the Company's] culture and emphasis on

24   diversity and inclusion."  *Id.* ¶¶ 54-55.[11]  These statements are not false for the reasons stated in

25   *Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) (citation omitted); *see also In re Rigel*

26   *Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885-86 (9th Cir. 2012); *Huang v. Avalanche Biotechnologies, Inc.*, 2016 WL 6524401, at *8-9 (N.D. Cal. Nov. 3, 2016).

27   [11] Plaintiff does not allege that the statements it challenges from AMD's website and in its

28   Corporate Social Responsibility Reports, Compl. ¶¶ 52-53, 56-58, were reproduced in AMD's Proxies, so they are not relevant to Plaintiff's Section 14(a) claim.  *See Krieger v. Atheros Commc'ns, Inc.*, 2012 WL 1933559, at *7 (N.D. Cal. May 29, 2012) (Koh, J.).

1    Section III.B.3, and failure to "show[] that the proxy statement made materially false or misleading

2    statements or contained any material omission" is grounds for dismissal.  *Seinfeld v. Bartz*, 322

3    F.3d 693, 699-700 (9th Cir. 2003); *see also Desaigoudar*, 223 F.3d at 1023-25 (holding that proxy

4    statement was not false for relying on a different, but still valid, definition of the word "profit"

5    from plaintiff).

6          ***Executive Compensation.***    Plaintiff also claims that AMD's "pay for performance"

7    approach to executive compensation "focus[es] on other matters at the exclusion of diversity" and

8    somehow operates to "keep[] African Americans off the Board."  Compl. ¶¶ 62-63.  Plaintiff's

9    suggestion that performance-based compensation is inconsistent with diversity is wrong, insulting,

10   and inconsistent with Plaintiff's own allegations.  *See* Compl. ¶¶ 3, 11 43-46 (citing studies finding

11   a "statistically significant relationship between a more diverse leadership team and better financial

12   performance").   And more to the point, the only AMD officer whose compensation Plaintiff

13   specifically discusses is Dr. Su, AMD's President and CEO.  *See id.* ¶¶ 69-70.  Accepting as true

14   Plaintiff's allegation that Dr. Su—a diverse woman—is paid significantly more than other AMD

15   employees actually undermines, rather than supports, any suggestion that AMD's compensation

16   philosophy suffers from racial bias.

17         ***Proxy Access, Majority Voting & Director Term Limits.***   The same is true of Plaintiff's

18   unfounded allegations that AMD's proxy access, majority voting, and lack of director term limits

19   serve "the unstated purpose" to "entrench current directors in office, which effectively prevents

20   African Americans from having a fair opportunity to be considered for the AMD Board."  Compl.

21   ¶¶ 73, 75, 77.  Plaintiff's inflammatory assertions are conclusory and unsupported by any factual

22   allegations—which is unsurprising because there are no facts that Plaintiff could allege consistent

23   with its obligations under the Rules.  Of AMD's eight directors, half were appointed in 2017 or

24   later, and only one has served for more than seven years—hardly "entrenched."  Ex. E at 8-10.

25   Plaintiff makes zero effort to substantiate its wholly conclusory allegations that AMD's proxy

26   access, majority voting rules, and lack of director term limits were instituted to keep African

27   Americans off the Board.  Nor does Plaintiff make even the slightest effort to allege how these

28   long-standing corporate governance mechanisms—all of which were fully disclosed and are used

by thousands of similar public companies—could somehow constitute false or misleading statements or omissions.[12]  *Desaigoudar*, 223 F.3d at 1023-25; *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 413 (S.D.N.Y 2019) (rejecting conclusory allegations of falsity). Plaintiff alleges no facts explaining why these routine corporate governance procedures are false or misleading.

***The Alleged Misstatements And Omissions Are Immaterial As A Matter Of Law.*** Plaintiff's Section 14(a) claim fails for the independent reason that it is based on statements that are immaterial as a matter of law.  Plaintiff's claim, at its core, is that the Individual Defendants failed to disclose their allegedly deficient oversight of AMD's diversity and inclusion efforts—the same purported misconduct underlying its primary fiduciary duty and related state law claims.  But the Ninth Circuit has held that such alleged nondisclosure of a purported "breach of fiduciary duty . . . is *never* material for § 14(a) purposes."  *Gaines v. Haughton*, 645 F.2d 761, 776-77 (9th Cir. 1981), *overruled on other grounds, Matter of McLinn*, 739 F.2d 1395 (9th Cir. 1984); *see also Guo v. Mahaffy*, 2020 WL 5798531, at *5-6 (D. Colo. Sept. 29, 2020) (discussing various circuits concluding that "a plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim") (citation omitted).

        2.     <u>Plaintiff Fails To Allege That The Proxies Were An "Essential Link" To The Purportedly Loss-Generating Corporate Action</u>

The Complaint also fails to demonstrate that "the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction" that ultimately caused a corporate harm. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970).  This "essential link requirement can only be established when the proxy statement at issue *directly* authorizes the loss-generating corporate action."  *Kelley v. Rambus, Inc.*, 2008 WL 5170598, at *7 (N.D. Cal. Dec. 9, 2008) (emphasis in original) (citation omitted); *see also Krieger*, 2012 WL 1933559, at *7-8 (dismissing Section 14(a) claim for failing to "connect any proxy misstatements or omissions with an actual economic harm").  As a corollary, "damages [that] are not a result of the corporate action authorized by the

---

[12] For example, the Proxies make clear that one Board member, Mr. Caldwell, has served for nearly 15 years, but must be reelected annually.  Ex. E at 7, 8.  The Company's lack of term limits is not a secret.

1  proxy statement . . . are not the type of damages sought to be remedied by Section 14(a)."  *Corwin*
2  *v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984).

3         To start, Plaintiff's claim fails because it has not identified *any* cognizable harm suffered
4  by the Company, let alone a harm *caused* by the Proxies.  *See In re Verisign, Inc. Deriv. Litig.*,
5  531 F. Supp. 2d 1173, 1213 (N.D. Cal. 2007) (dismissing Section 14(a) claim where "plaintiffs
6  fail[ed] to allege . . . [a] direct injury suffered by [defendant] as a corporation as a direct result of
7  the transaction that was at immediate issue in the proxy (election of directors)").  Plaintiff alleges
8  that AMD "was damaged as a result of the material misrepresentations and omissions in the Proxy
9  Statements," Compl. ¶ 108, but is completely silent as to *how*.  This alone is grounds for dismissal.
10 *See In re Verisign*, 531 F. Supp. 2d at 1213 (requiring "pecuniary injury for which recovery is
11 sought"); *see also Gaines*, 645 F.2d at 778 n.30 (refusing to expand Section 14(a) where "no
12 pecuniary injury to the corporation would be required to state a claim").  Simply put, Plaintiff
13 cannot plausibly allege harm to AMD given how successful the Company has been under the
14 leadership of Dr. Su, Mr. Kumar, and the current Board.  *See supra* Section II.C.[13]

15                    3.    Plaintiff's Claim Is Time-Barred As To The 2018 And 2019 Proxies

16        The limitations period for a Section 14(a) claim is the earlier of one year after discovery of
17 the alleged violation or three years from its occurrence.  *In re Verisign*, 531 F. Supp. 2d at 1212.
18 A plaintiff need not know all the facts underlying the complaint to have been on inquiry notice of
19 a purported violation.  Rather, the statute of limitations is triggered "when a prospective plaintiff
20 receives notice of his or her claim" such that she becomes aware of warnings that "there were
21 either misleading statements or significant omissions involved."  *Lane v. Page*, 649 F. Supp. 2d
22 1256, 1298 (D.N.M. 2009).  Here, Plaintiff asserts that portions of the 2018 and 2019 Proxies were
23 false or misleading, but all of the facts that Plaintiff uses to support that claim—the Board's
24 composition, executive compensation philosophy, proxy access and director term limits, and other

25

26 [13] Likewise, any argument that the Proxies were an "essential link" because they reelected directors
   who allegedly caused other losses, Compl. ¶ 79, is "precisely the sort of claim that courts have
27 repeatedly found insufficient to satisfy the transaction causation requirement" of Section 14(a).
   *Levitt v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992); *see also In re Diamond Foods, Inc. Deriv.
28 Litig.*, 2012 WL 1945814, at *7 (N.D. Cal. May 29, 2012); *In re Paypal*, 2018 WL 466527, at *4;
   *In re HP Deriv. Litig.*, 2012 WL 4468423, at *11 (N.D. Cal. Sept. 25, 2012).

1  factors—have existed and been publicly disclosed for years.  It necessarily follows that Plaintiff

2  would have been immediately on notice of those purported misrepresentations at the time of the

3  2018 and 2019 Proxies' public filing on March 19, 2018, and March 21, 2019.  The one-year period

4  for Plaintiff to raise its Section 14(a) claims as to the 2018 and 2019 Proxies therefore expired long

5  before Plaintiff filed suit.  *See Hamilton v. Barnes*, 2018 WL 4053459, at *15 (N.D. Cal. Aug. 24,

6  2018), *aff'd in part and rev'd in part on other grounds*, 806 F. App'x 536 (9th Cir. 2020) (holding

7  that Section 14(a) claims against AMD were time-barred because they were not lodged until two

8  years after AMD disclosed the "occurrences giving rise to" the 14(a) claims in another SEC filing).

9  **IV.**     **CONCLUSION**

10      For the foregoing reasons, the Court should dismiss this action with prejudice for failure to

11  make a pre-suit demand on the AMD Board as required by FRCP 23.1, which is a threshold

12  pleading requirement for all three of its claims: (i) breach of fiduciary duty, (ii) unjust enrichment,

13  and (iii) violation of Section 14(a) of the Exchange Act.

14

15  Dated:  December 18, 2020                          Respectfully submitted,

16                                                    LATHAM & WATKINS LLP

17                                                    By /s/ *Elizabeth L. Deeley*
                                                     Elizabeth L. Deeley (Bar No. 230798)
18                                                    Morgan E. Whitworth (Bar No. 304907)
                                                      elizabeth.deeley@lw.com
19                                                     morgan.whitworth@lw.com
                                                     505 Montgomery Street, Suite 2000
20                                                    San Francisco, California 94111
                                                     T:  +1.415.391.0600 / F:  +1.415.395.8095
21
                                                     William J. Trach (*pro hac* vice)
22                                                     william.trach@lw.com
                                                     200 Clarendon Street
23                                                    Boston, MA 02116
                                                     T:  +1.617.948.6000 / F:  +1.617.948.6001
24
                                                     Jason C. Hegt (*pro hac vice*)
25                                                     jason.hegt@lw.com
                                                     885 Third Avenue, Suite 1000
26                                                    New York, New York 10022
                                                     T: +1.212.906.1200 / F: +1.212.751.4864
27

28

Hilary H. Mattis (Bar No. 271498)
 *hilary.mattis@lw.com*
140 Scott Drive
Menlo Park, CA  94025
T:  +1.650.328.4600 / F:  +1.650.463.2600

*Attorneys for John E. Caldwell, Nora M.
Denzel, Mark Durcan, Michael P. Gregoire,
Joseph A. Householder, John W. Marren, Abhi
Y. Talwalkar, Lisa T. Su and Nominal
Defendant Advanced Micro Devices, Inc.*

**APPENDIX A**

| CHALLENGED STATEMENT | SOURCE |
|---|---|
| 1.  AMD undertakes efforts to increase "the number of women and under-represented minorities in the technology industry, and to supporting efforts to effect systemic and lasting change." | Compl. ¶ 52 (quoting Ex. B (2020 Corporate Responsibility Report) at 2). |
| 2.  "AMD is growing a diverse, inclusive workforce that embraces different perspectives and experiences to foster innovation, challenge the status quo when needed, and drive business performance." | Compl. ¶¶ 52, 57 (quoting Ex. B (2020 Corporate Responsibility Report) at 31). |
| 3.  "We are constantly striving to improve our gender and diversity numbers through specific programs, as is the case across the technology sector." | Compl. ¶¶ 52, 57 (quoting Ex. B (2020 Corporate Responsibility Report) at 31). |
| 4.  "We will continue our efforts to recruit diverse talent and foster an inclusive and innovative culture, where the best ideas 'win' regardless of the individual's identity." | Compl. ¶ 52 (quoting Ex. B (2020 Corporate Responsibility Report) at 31. |
| 5.  "Building a diverse talent pipeline, encouraging a culture of respect and belonging, and increasing inclusion of under-represented groups, makes AMD stronger." | Compl. ¶ 53 (quoting Ex. B (2020 Corporate Responsibility Report) at 31). |
| 6.  "Innovation, which is at AMD's core, occurs when creative minds and diverse perspectives are drawn from all over the world. Diverse teams, when managed in a culture of inclusion, are more creative, more productive, better at problem solving, and ultimately more profitable." | Compl. ¶ 53 (quoting Ex. B (2020 Corporate Responsibility Report) at 31). |
| 7.  The AMD Board seeks to "foster and maintain a diversity of viewpoints, backgrounds and experience on the Board," and thus "the Nominating and Corporate Governance Committee evaluates the mix of skills and experience of the directors and assesses nominees and potential candidates in the context of the current composition of the Board and [AMD's] requirements, taking into consideration the diverse communities and geographies in which [AMD] operate[s]." | Compl. ¶ 54 (quoting Ex. E (2020 Proxy) at 17; Ex. M (2019 Proxy) at 19; and Ex. N (2018 Proxy) at 19). |
| 8.  As a part of succession planning for key executive roles, AMD assesses "candidates and their development plans . . . with considerations for alignment not only with | Compl. ¶ 55 (quoting Ex. E (2020 Proxy) at 36). |

| CHALLENGED STATEMENT | SOURCE |
|---|---|
| required skills but also with [the Company's] culture and emphasis on diversity and inclusion." | |
| 9.  "Aligned with the company's commitment to diversity and inclusion and in light of recent events that highlight the work still ahead to end racism and social injustice, AMD announced its first steps to cultivate change with donations to high-impact non-profits focused on social and racial equality and support for their empowerment, scholarship and mentorship programs." | Compl. ¶ 57 (quoting AMD Press Release titled, "AMD Commemorates 25 Years of Corporate Responsibility Reporting"). |
| 10.  "Since 2018, we review annually our Diversity, Belonging, and Inclusion strategies and metrics with members of the AMD Board of Directors." | Compl. ¶ 57 (quoting Ex. B (2020 Corporate Responsibility Report) at 31). |
| 11.  "At AMD, we harness our world-class technology to take on some of the world's toughest problems. This can't be done alone. It takes a diverse group of voices gathered together – every day of the week – to find solutions and drive our business growth. We thrive through respect for and inclusion of our employees' individual talents, personalities, experiences and passions. Differences challenge us in a healthy way – and improve our capability to bring the benefits of high-performance computing to consumers in a more meaningful manner. From many voices, we create one vision of the future, together." | Compl. ¶ 58 (quoting AMD's 2019 Corporate Responsibility Report). |