UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF PONTIAC POLICE AND FIRE RETIREMENT SYSTEM,<br><br>Plaintiff,<br><br>v.<br><br>JOHN E. CALDWELL, et al.,<br><br>Defendants. | Case No. 20-CV-06794-LHK<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 25 |

Plaintiff City of Pontiac Police and Fire Retirement System brings this shareholder derivative suit against Advanced Micro Devices, Inc.'s Board of Directors ("the Board" or "Defendants"). Before the Court is the Board's motion to dismiss pursuant to Federal Rule of Civil Procedure 23.1, which requires derivative plaintiffs to plead demand futility with particularity. ECF No. 25 ("motion to dismiss" or "MTD"). Having considered the parties' briefing, the relevant law, and the record in this case, the Court GRANTS the Board's motion to dismiss with leave to amend as to the theories of demand futility that Plaintiff has not abandoned.

**I.   BACKGROUND**

**A. Factual Background**

Plaintiff City of Pontiac Police and Fire Retirement System is a shareholder of Advanced

Micro Devices, Inc. ("AMD"), a publicly traded global semiconductor company incorporated in Delaware. Compl. ¶¶ 1, 25, ECF No. 1. Plaintiff brings this shareholder derivative suit on behalf of AMD against AMD's Board of Directors. *Id.* The Board comprises eight Directors: John E. Caldwell, Nora M. Denzel, Mark Durcan, Michael P. Gregoire, Joseph A. Householder, John W. Marren, Abhi Y. Talwalkar, and Chief Executive Officer ("CEO") Lisa T. Su. *Id.* ¶¶ 26–33. According to the Board, CEO Su was one of three women of color leading a Fortune 500 company at the time of Plaintiff's lawsuit. MTD at 5 (citing Ex. G, Courtney Connley, *The number of women running Fortune 500 companies hits a new high*, CNBC (May 19, 2020)).

Plaintiff alleges that the Board has "publicly misrepresented AMD as a company that effectively promotes diversity throughout its ranks, including in the boardroom." *Id.* ¶ 2. Plaintiff alleges that AMD in fact "has lacked and continues to lack diversity" because no African Americans serve on AMD's Board or executive team.[1] *Id.* ¶¶ 2, 6. Specifically, Plaintiff identifies 11 Statements which allegedly misrepresent that AMD is "diverse" despite its lack of African American leadership:

| # | Challenged Statement | Source |
|---|---|---|
| 1 | AMD makes efforts to increase "the number of women and under-represented minorities in the technology industry, and to supporting efforts to effect systemic and lasting change." | Compl. ¶ 52 (quoting MTD, Ex. B (2020 Corporate Responsibility Report) at 2). |
| 2 | "AMD is growing a diverse, inclusive workforce that embraces different perspectives and experiences to foster innovation, challenge the status quo when needed, and drive business performance." | Compl. ¶¶ 52, 57 (quoting MTD, Ex. B (2020 Corporate Responsibility Report) at 31). |
| 3 | "We are constantly striving to improve our gender and | Compl. ¶¶ 52, 57 (quoting |

---

[1] The executive team comprises 17 people. Compl. ¶ 7. They are Lisa T. Su, Rick Bergman, Darren Grasby, Devinder Kumar, Mark Papermaster, Martin Ashton, Ruth Cotter, Mark Fuselier, Robert Gama, Keivan Keshvari, Dan McNamara, Saeid Moshkelani, Sam Naffziger, Forrest Norrod, Spencer Pan, Jane Roney, David Wang, Harry Wolin, Nazar Zaidi, and Andrej Zdrakovic. *See AMD Executive Team*, https://www.amd.com/en/corporate/leadership (last visited July 1, 2021).

| | | |
|---|---|---|
| | diversity numbers through specific programs, as is the case across the technology sector." | MTD, Ex. B (2020 Corporate Responsibility Report) at 31). |
| 4 | "We will continue our efforts to recruit diverse talent and foster an inclusive and innovative culture, where the best ideas 'win' regardless of the individual's identity." | Compl. ¶ 52 (quoting MTD, Ex. B (2020 Corporate Responsibility Report) at 31. |
| 5 | "Building a diverse talent pipeline, encouraging a culture of respect and belonging, and increasing inclusion of underrepresented groups, makes AMD stronger." | Compl. ¶ 53 (quoting MTD, Ex. B (2020 Corporate Responsibility Report) at 31). |
| 6 | "Innovation, which is at AMD's core, occurs when creative minds and diverse perspectives are drawn from all over the world. Diverse teams, when managed in a culture of inclusion, are more creative, more productive, better at problem solving, and ultimately more profitable." | Compl. ¶ 53 (quoting MTD, Ex. B (2020 Corporate Responsibility Report) at 31). |
| 7 | The Board seeks to "foster and maintain a diversity of viewpoints, backgrounds and experience on the Board," and thus "the Nominating and Corporate Governance Committee evaluates the mix of skills and experience of the directors and assesses nominees and potential candidates in the context of the current composition of the Board and [AMD's] requirements, taking into consideration the diverse communities and geographies in which [AMD] operate[s]." | Compl. ¶ 54 (quoting MTD, Ex. E (2020 Proxy) at 17; MTD, Ex. M (2019 Proxy) at 19; and MTD, Ex. N (2018 Proxy) at 19). |
| 8 | As a part of succession planning for key executive roles, AMD assesses "candidates and their development plans . . . with considerations for alignment not only with required skills but also with [the Company's] culture and emphasis on diversity and inclusion." | Compl. ¶ 55 (quoting MTD, Ex. E (2020 Proxy) at 36). |
| 9 | "Aligned with the company's commitment to diversity and inclusion and in light of recent events that highlight the work still ahead to end racism and social injustice, AMD announced its first steps to cultivate change with donations to high-impact nonprofits focused on social and racial equality and support for their empowerment, scholarship and mentorship programs." | Compl. ¶ 57 (quoting AMD Press Release titled, "AMD Commemorates 25 Years of Corporate Responsibility Reporting (July 30, 2020)"). |
| 10 | "Since 2018, we review annually our Diversity, Belonging, and Inclusion strategies and metrics with members of the AMD Board of Directors." | Compl. ¶ 57 (quoting MTD, Ex. B (2020 Corporate Responsibility Report) at 31). |

| | | |
|---|---|---|
| 11 | "At AMD, we harness our world-class technology to take on some of the world's toughest problems. This can't be done alone. It takes a diverse group of voices gathered together – every day of the week – to find solutions and drive our business growth. We thrive through respect for and inclusion of our employees' individual talents, personalities, experiences and passions. Differences challenge us in a healthy way – and improve our capability to bring the benefits of high performance computing to consumers in a more meaningful manner. From many voices, we create one vision of the future, together." | Compl. ¶ 58 (quoting AMD's 2019 Corporate Responsibility Report). |

In Plaintiff's view, the Board violated two duties by making these Statements while no African Americans served on AMD's Board or executive team. First, the Board allegedly violated its duty to maximize shareholder value. Compl. ¶¶ 39–41, 93–94. To support this allegation, Plaintiff cites reports by the management consulting firm McKinsey & Company. *Id.* ¶¶ 43–48. McKinsey has found that companies with relatively high "ethnic and cultural diversity" tend to be more profitable than their peers. *Id.* ¶ 47 (quoting, *e.g.*, Vivian Hunt et al., *Diversity wins: How inclusion matters* at 3–4, McKinsey & Company (May 19, 2020), https://www.mckinsey.com/featuredinsights/ diversity-and-inclusion/diversity-wins-how-inclusion-matters).

Second, the Board allegedly violated its "duty to be truthful." Compl. ¶¶ 12, 101. The Statements are untruthful in Plaintiff's view because the Board allegedly does not "seek[] to achieve representation of diverse persons – *i.e.*, African Americans." *Id.* ¶ 60.

Plaintiff lastly alleges that most of the Directors face a substantial likelihood of personal liability for violating these duties. *Id.* ¶¶ 98–99, 113. Thus, Plaintiff asserts that a pre-suit demand to the Board would be futile. *E.g.*, *id.* ¶ 101. Yet relevant to the Directors' personal liability for breaches of fiduciary duty is the "exculpatory provision" in AMD's Amended and Restated Certificate of Incorporation. This exculpatory provision forecloses Directors' personal liability for negligent or nonintentional breaches of their duty of care. Specifically, the exculpatory provision provides that:

4

> A director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

MTD, Ex. O at 3.

### B. Procedural History

On September 29, 2020, Plaintiff brought this shareholder derivative suit against the Board. ECF No. 1. Plaintiff's Complaint alleges three claims against the Board. Count 1 is that the Board violated Exchange Act § 14(a) and Securities and Exchange Commission ("SEC") Rule 14a-9. Compl. ¶¶ 103–08. Count 2 is that the Board breached fiduciary duties of loyalty, good faith, due care, oversight, and candor. *Id.* ¶¶ 109–13. Lastly, Count 3 is that the Board unjustly enriched itself at the expense of AMD. *Id.* ¶¶ 114–16.

The Board moved to dismiss the Complaint on December 18, 2020. ECF No. 25. Plaintiff opposed the Board's motion to dismiss on February 12, 2021. ECF No. 30 ("Opposition" or "Opp'n"). On March 12, 2021, the Board filed a reply supporting its motion to dismiss. ECF No. 32.

### C. Request for Judicial Notice or Incorporation by Reference

Pursuant to the doctrines of judicial notice and incorporation by reference, the Board asks the Court to consider 19 exhibits to the motion to dismiss. ECF No. 26. As a general matter, the Ninth Circuit has provided guidance on the applicability of the doctrines of judicial notice and incorporation by reference in securities cases at the motion to dismiss stage. In *Khoja v. Orexigen Therapeutics*, 899 F.3d 988 (9th Cir. 2018), the Ninth Circuit "note[d] a concerning pattern in securities cases [sounding in fraud]: exploiting [judicial notice and incorporation by reference] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Id.* at 998. The Ninth Circuit explained that "[d]efendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint, and

hopefully dismiss the case at an early stage." *Id.* However, the risk of improper premature dismissal "is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." *Id.*

Here, Plaintiff opposes the Board's request only as to eight exhibits: Exhibits C (Carnegie article on CEO Su), D (biography of Devinder Kumar), F (Fortune article on CEO Su), G (CNBC article on women CEOs), H (AMD's historical stock price), J (CNBC article on stocks), K (CNBC article on AMD), and Q (article on Nasdaq's proposed listing requirements). *See* Opp'n 12 n.4. The Court DENIES without prejudice the Board's request as to these exhibits because they "are not necessary to the resolution of [the Board's] motion." *In re Cloudera, Inc.*, No. 19-CV-03221-LHK, 2021 WL 2115303, at *9 (N.D. Cal. May 25, 2021).

The remaining exhibits are SEC filings, public AMD documents, and a McKinsey report quoted in the Complaint. *See* ECF No. 26 at 2–4. The SEC filings and public AMD documents are proper subjects of judicial notice. *See, e.g.*, *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings); *In re Intel Corp. Sec. Litig.*, No. 18-CV-00507-YGR, 2019 WL 1427660, at *6 & n.8 (N.D. Cal. Mar. 29, 2019) (documents on company website). The McKinsey report, which the Complaint quotes and cites "extensively," is incorporated by reference into the Complaint. *Khoja*, 899 F.3d at 1002; *see* Compl. ¶¶ 3, 43, 45, 47 (quoting and citing McKinsey report). Accordingly, the Court GRANTS the Board's unopposed request for judicial notice of the remaining exhibits. "The Court considers [these exhibits] in evaluating the motion to dismiss for the sole purpose of determining what representations [the Board] made to the market. The Court is not taking notice of the *truth* of any of the facts asserted." *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018) (emphasis in original).

## II.  LEGAL STANDARD

### A. Dismissal Under Federal Rule of Civil Procedure 23.1

"A derivative action is an extraordinary process where courts permit 'a shareholder to step into the corporation's shoes and to seek in its right the restitution he could not demand in his

6

Case No. 20-CV-06794-LHK
ORDER GRANTING MOTION TO DISMISS

own.'" *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010) (quoting *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983)). "Accordingly, strict compliance with [Federal Rule of Civil Procedure] 23.1 and the applicable substantive law is necessary before a derivative suit can wrest control of an issue from the board of directors." *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008). Rule 23.1 imposes a "heightened pleading standard." *Louisiana Mun. Police Employees' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1058 (9th Cir. 2016). Part of the heightened standard is the requirement to plead "demand futility" with particularity: that is, to "'state with particularity any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and the reasons for not obtaining the action or not making the effort." *Towers v. Iger*, 912 F.3d 523, 528 (9th Cir. 2018) (quoting Fed. R. Civ. P. 23.1(b)(3)). "The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quoting *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004)).

**B. Leave to Amend**

If the Court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, " 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

7

Case No. 20-CV-06794-LHK
ORDER GRANTING MOTION TO DISMISS

## III. DISCUSSION

The Board moves to dismiss the Complaint on one ground: Plaintiff has failed to adequately plead demand futility under Federal Rule of Civil Procedure 23.1 and Delaware law. MTD at 1; Reply at i (Table of Contents). Below, the Court first details the stringent standard for pleading demand futility. The Court then explains how Plaintiff has failed to meet that standard.

### A. To plead demand futility, Plaintiff must "plead facts specific to each Director" that show that most Directors knowingly violated a fiduciary duty.

Rule 23.1(b)(3) requires Plaintiff to "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors . . . ; and (B) the reasons for not obtaining the action or not making the effort."

Here, it is undisputed that Plaintiff did not make any demands to the Board before filing this lawsuit. *E.g.*, Compl. ¶ 18 (arguing that "a pre-suit demand on the AMD Board is excused as futile"). Plaintiff also does not dispute that Delaware law determines whether pre-suit demand was futile. "The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quoting *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004)). AMD is incorporated in Delaware. Compl. ¶ 25; *accord* Opp'n at 24–25 (applying Delaware law). Thus, to survive the motion to dismiss, Plaintiff must plead "with particularity" demand futility under Delaware law. Fed. R. Civ. P. 23.1(b)(3).

It is also undisputed that Rule 23.1(b)(3)'s demand futility requirement applies to all of Plaintiff's claims because "[f]ederal law governs procedural issues in this case." Opp'n at 8; *accord Sax v. World Wide Press, Inc.*, 809 F.2d 610, 613 (9th Cir. 1987) ("In federal courts, derivative suits are subject to the procedural requirements of Rule 23.1."). Indeed, courts regularly enforce the demand futility requirement even where, as here, a derivative plaintiff alleges violations of both federal and state law. *See, e.g.*, *Indiana Elec. Workers Pension Tr. Fund, IBEW v. Dunn*, 352 F. App'x 157, 160–62 (9th Cir. 2009) (affirming dismissal of federal and state law claims for failure to allege demand futility); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007) (dismissing federal claim for failure to allege demand futility and collecting

8

Case No. 20-CV-06794-LHK
ORDER GRANTING MOTION TO DISMISS

cases).

Plaintiff argues that demand would have been futile because the Board's Directors face "substantial liability for false statements about their own and AMD's commitment to diversity." Compl. ¶ 99; *accord* Opp'n at 24–25 (arguing same). In Plaintiff's view, the Statements detailed in Section I-A above are false because no African Americans were nominated to the Board—or served on AMD's executive team—at the time the Statements were made. *See, e.g.*, Compl. ¶ 61. Further, Plaintiff alleges that these Statements have failed to maximize shareholder value. *Id.* ¶¶ 39–41, 93–94. Plaintiff thus argues that the Directors have acted in bad faith or breached their fiduciary duty of loyalty, thereby triggering a risk of "substantial liability." Opp'n at 9.

Plaintiff's argument faces a high bar for three reasons. First, "[a]t the pleading stage, Board independence and compliance with the business judgment rule are presumed." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999), *as amended* (Aug. 4, 1999), *superseded by statute on other grounds as recognized in In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017). "Demand will be excused only if the plaintiff's allegations show the defendants' actions 'were *so egregious* that a substantial likelihood of director liability exists.'" *Id.* (emphasis added) (quoting *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). "The mere threat of personal liability" is not enough to plead demand futility. *Id.* (quoting same).

Second, as detailed in the Factual Background above, AMD's articles of incorporation contain an "exculpatory clause" that limits the personal liability of directors for breaches of fiduciary duty. *See* Section I-A, *infra* (quoting MTD, Ex. O at 3). "Because [AMD]'s articles of incorporation exculpated the Board's members from personal monetary liability," Plaintiff must "alleg[e] with particularity that a director *knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for her duties." *Towers v. Iger*, 912 F.3d 523, 529 (9th Cir. 2018) (emphasis in original) (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009)).

Lastly, "Delaware law does not permit the wholesale imputation of one director's

9

knowledge to every other for demand excusal purposes." *Id.* (quoting *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007)). Thus, "a derivative complaint must plead facts *specific to each director*, demonstrating that at least half of them" knowingly violated a fiduciary duty. *Id.* (emphasis in original) (quoting same); *accord, e.g.*, *Ocegueda on behalf of Facebook v. Zuckerberg*, No. 20-CV-04444-LB, --- F. Supp. 3d ----, 2021 WL 1056611, at *6 (N.D. Cal. Mar. 19, 2021) (holding same and dismissing complaint); *In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1020–21 (N.D. Cal. 2015) (same).

**B. Plaintiff fails to plead demand futility.**

Plaintiff fails to clear the high bar for pleading demand futility. Specifically, Plaintiff fails to "plead facts *specific to each [D]irector*[] demonstrating that at least half of them" *knowingly* violated a fiduciary duty. *Towers*, 912 F.3d at 529 (emphasis in original) (quoting *Desimone*, 924 A.2d at 943). In fact, Plaintiff fails to plead *any* particularized allegations specific to any Director.

Plaintiff's Opposition underscores the insufficiency of Plaintiff's Complaint in two ways. To start, Plaintiff abandons three theories of demand futility that Defendants challenge in their motion to dismiss. First, Plaintiff abandons any allegation that AMD has "defective internal controls" or that the Directors failed to oversee employees. Opp'n at 25. Second, Plaintiff fails to dispute that "merely naming a director as a defendant" is insufficient. Mot. at 13; *see* Reply at 6 n.3 (noting Plaintiff's abandonment). Third, Plaintiff fails to dispute that "the fact that certain directors served on two committees of AMD's Board does nothing to create a substantial likelihood of liability for those directors." Mot. at 13; *see* Reply at 6 n.3 (noting Plaintiff's abandonment). Accordingly, the Court dismisses these abandoned theories, which Plaintiff "may not revive" through amendment. *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 681 (9th Cir. 2018) (affirming dismissal where plaintiff failed to "defend [a] claim in response to [] motions to dismiss").

Having abandoned three theories of demand futility, Plaintiff relegates its remaining demand futility arguments to a cursory page and a half at the end of the Opposition. *See* Opp'n at 24–25. There, Plaintiff identifies the paragraphs of the Complaint and case law that purportedly

10

Case No. 20-CV-06794-LHK
ORDER GRANTING MOTION TO DISMISS

show demand futility. Below, the Court first analyzes the Complaint and then Plaintiff's cited case law.

### 1. The Complaint fails to plead facts specific to any Director, let alone most of the Directors.

To plead demand futility, Plaintiff cites the following paragraphs of the Complaint: ¶¶ 2, 8, 12–19, 42, 68, 92–101, and 112–113. Opp'n at 24–25. None of these paragraphs makes any allegations specific to a Director, let alone a Director's "knowing" violation of a fiduciary duty. Rather, without explanation, the Complaint groups the Directors together as all "similarly situated." Opp'n at 19. The following five allegations exemplify the Complaint's conclusory nature:

- ¶ 68: "Ostensibly, the[] [S]tatements convey to AMD investors and the public that the Company actively promotes 'diversity' in the boardroom. But in fact, Defendants have made no real effort to promote racial diversity on the Board."

- ¶ 92: "The AMD Board has eight members: Defendants Caldwell, Denzel, Durcan, Gregoire, Householder, Marren, Talwalkar and Su. A pre-suit demand on the AMD Board to commence this action is excused as a futile."

- ¶ 100: "The business judgment rule, a form of privilege itself, should not be above similar scrutiny. Especially in an action like this, which seeks to hold Defendants accountable for the absence of any male or female African American directors on AMD's Board, despite Defendants' public proclamations that AMD 'is committed to increasing the number of women and under-represented minorities in the technology industry' and 'will actively identify candidates who could enhance the diversity represented on the Board.'"

- ¶ 101: "Given the gravity of the claims, there is ample reason to doubt that Defendants can adequately detach themselves from not just the facts alleged, but also from the financial, social and reputational dynamics at play, to fairly consider a pre-suit demand. Without full confidence in Defendants' ability, individually and collectively, to evaluate a pre-suit demand with disinterest, impartiality and objectivity, and without concern for any personal considerations, financial or otherwise, a pre-suit demand on the AMD Board to commence this action is excused as futile."

- ¶ 112: "Specifically, each of the Defendants, in breach of their fiduciary duties of care, loyalty and good faith, intentionally or recklessly caused the Company to disseminate to AMD shareholders materially misleading and inaccurate information through, among other things, the SEC filings and other public statements and disclosures as detailed herein. Defendants had actual knowledge of their misrepresentations and omissions of material

11
Case No. 20-CV-06794-LHK
ORDER GRANTING MOTION TO DISMISS

fact or acted with reckless disregard for the truth in failing to ascertain and disclose such facts even though such facts were available to them."

As exemplified by these allegations, the Complaint engages in what Delaware law expressly forbids: "the wholesale imputation" of knowledge to every Director for demand excusal purposes. *Towers*, 912 F.3d at 530 (quoting *Desimone*, 924 A.2d at 943). In other words, "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the [B]oard must have known so." *Id.* (quoting *Desimone*, 924 A.2d at 940); *accord, e.g.*, *In re CNET Networks*, 483 F. Supp. 2d at 963 ("Mere membership on a committee or board, without specific allegations as to defendants' roles and conduct, is insufficient to support a finding that directors were conflicted.").

*Towers* is especially instructive. There, the Ninth Circuit affirmed dismissal of a complaint despite allegations of demand futility much stronger than the allegations here. The *Towers* complaint alleged that the board of The Walt Disney Company ("Disney") participated in a "no-poach" conspiracy with other animation studios "to refrain from recruiting each other's employees." *Towers*, 912 F.3d at 525; *see generally Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016) (certifying class of animation employees challenging same alleged conspiracy). To plead demand futility, the *Towers* plaintiff detailed three allegations supported by documentation. First, plaintiff alleged that "high-ranking Disney officers knew of the conspiracy and discussed its implications" in quoted emails. *Towers*, 912 F.3d at 529. Second, plaintiff alleged that the chairman of Disney's animation subsidiary likely told Disney's board about the conspiracy because he "was freely discussing the conspiracy with the heads of other companies." *Id.* at 530. Third, plaintiff alleged that board members oversaw the acquisition of Pixar in light of "employment issues and the overall competition for talent"—and that "[Steve] Jobs, allegedly a primary player in the conspiracy, spoke to the [b]oard regarding the acquisition." *Id.* at 531. In sum, the *Towers* plaintiff argued that "a collective analysis of the allegations in the [] [c]omplaint, viewed in the light most favorable to [p]laintiff, and with all reasonable inferences drawn in his favor, establish at least a reasonable inference that a majority of the Board at the time

12

the complaint was filed were aware of the [conspiracy], if not also actively participating in [it]." *Id.* at 529.

The district court dismissed the *Towers* complaint for failing to plead particularized facts showing demand futility, and the Ninth Circuit affirmed. *Id.* at 532. The Ninth Circuit held that the complaint "play[ed] inferential hopscotch" in violation of "Rule 23.1's stringent requirements of factual particularity." *Id.* at 531 (internal quotation marks omitted) (quoting *Horman v. Abney*, No. 12290-VCS, 2017 WL 242571, at *12 (Del. Ch. Jan. 19, 2017)). To reach this holding, the Ninth Circuit carefully parsed the three allegations above. First, the Ninth Circuit reasoned that even if corporate officers "guided the conspiracy" and "communicated with the [b]oard" on related matters, that alone failed to "allege with particularity that information regarding the conspiracy was ever transmitted to the Board." *Id.* at 530. Second, the Ninth Circuit reasoned that "we cannot infer that [the chairman of Disney's animation subsidiary] shared his knowledge with other members of the [b]oard simply because he discussed the conspiracy with [Pixar's president, the alleged 'architect of the conspiracy']." *Id.* at 531. Lastly, the Ninth Circuit explained that "discussion of [] employment-related topics" during the Pixar acquisition "does not permit us to infer that the [b]oard knew of the conspiracy." *Id.* at 531. This potentially suspicious discussion constituted "merely [] proximity to the conspiracy or the alleged misconduct of Disney officers." *Id.*

The instant Complaint makes greater inferential leaps than even the *Towers* complaint. To summarize, the *Towers* complaint detailed (1) emails in which high-ranking corporate officers guided the alleged conspiracy; (2) emails between a former board member and the alleged architect of the conspiracy; and (3) minutes of board meetings that included "a primary player in the conspiracy" and led to an acquisition that allegedly furthered the conspiracy. *Id.* at 529–31. The Ninth Circuit found these details too vague to plead demand futility. *Id.* at 532. The instant Complaint is vaguer. It fails to identify *any* communications, meetings, or other particularized facts which show that anyone "*knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act." *Towers*, 912 F.3d at 529 (emphasis in original) (quoting *In re Citigroup Inc.*

13
Case No. 20-CV-06794-LHK
ORDER GRANTING MOTION TO DISMISS

*S'holder Derivative Litig.*, 964 A.2d at 125). At most, the instant Complaint lumps the Directors together and implies their "mere[] [] proximity to the" alleged violation: public Statements committing AMD to "diversity" while no African Americans were nominated to the Board. *Id.* at 531; *see* Section I-A, *supra* (listing the Statements, such as "[AMD] will continue our efforts to recruit diverse talent"). Thus, Plaintiff fails to meet "Rule 23.1's stringent requirements of factual particularity." *Id.* (internal quotation marks omitted) (quoting *Horman*, 2017 WL 242571, at *12).

### 2. Plaintiff's cited case law is unavailing.

The three cases Plaintiff cites for demand futility are inapposite. *See* Opp'n at 24. None of the cases addresses diversity issues or even liability for allegedly misleading investors. Rather, the cases hold that demand is futile where, unlike here, directors received many reports flagging repeated violations of federal law.

In *Rosenbloom v. Pyott*, Allergan shareholders sued Allergan's board shortly after Allergan "settled several *qui tam* suits and pled guilty in a criminal case" for off-label marketing of Botox. 765 F.3d 1137, 1141 (9th Cir. 2014). The Ninth Circuit held that the shareholders had adequately pleaded demand futility given "over a decade . . . of *widespread* and *enduring* illegality in Allergan's corporate activity." *Id.* at 1154 (emphasis in original). Specifically, Allergan's board had "'closely and regularly monitored' potentially illicit activities; 'received data' that 'qualified as a "red flag"' of illegality; and 'received repeated FDA warnings about illegal' activities." *Towers*, 912 F.3d at 532 (quoting and distinguishing *Rosenbloom*, 765 F.3d at 1152–54). Here, by contrast, the Complaint lacks a "battery of particularized factual allegations" that AMD's Board has received repeated governmental warnings that its Statements would lead to civil and criminal liability. *Rosenbloom*, 765 F.3d at 1152.

Plaintiff's second cited case mirrors *Rosenbloom*. In *Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), Pfizer shareholders sued shortly after Pfizer paid criminal and civil fines (totaling $2.3 billion) for the off-label marketing of drugs "with dangerous side effects." *Id.* at 455–56. In their derivative complaint, the shareholders "detail[ed] at great length a large number of reports made to members of the board from which it may reasonably be

14

inferred that [the directors] all knew of Pfizer's continued misconduct and chose to disregard it." *Id.* at 460. Those numerous reports included "FDA violation notices" and "reports . . . of continuing kickbacks and off-label marketing." *Id.* Moreover, "[m]any of these disturbing reports were received during the same time that the board was obligated by [two settlements with the federal government] to pay special attention to these very problems." *Id.* at 460–61. Here, by contrast, Plaintiff has not alleged that AMD has received governmental reports that its Statements violate federal law. Nor has Plaintiff alleged that AMD's Board is obligated by any legal settlement "to pay special attention" to the diversity issues alleged in the Complaint.

Plaintiff lastly cites *In re Veeco Instruments, Inc. Securities Litigation*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006). There, Veeco shareholders alleged that Veeco's board ignored "flagrant, systematic[,] and repeated violations of export control laws." *Id.* at 278. Specifically, the shareholders pleaded with particularity that five Veeco directors ignored two whistleblower reports—and an audit report—which revealed that at least ten specific shipments violated federal export laws. *Id.* These "reported violations threatened to jeopardize the future viability of Veeco" because even a single violation could have suspended Veeco's export privileges. *Id.* Again, the instant case is markedly different. Plaintiff has not alleged that any Director—let alone most Directors—has ignored any whistleblower or audit report that the Statements are false. Nor has Plaintiff alleged that the Board must be conscious of its wrongdoing because the Statements "threaten[] to jeopardize the future viability of [AMD]." *Id.*

All told, Plaintiff's cited cases are unavailing. They fail to contest that Plaintiff has not "ple[]d facts *specific to each [D]irector*[] demonstrating that at least half of [the Board]" *knowingly* violated a fiduciary duty. *Towers*, 912 F.3d at 529 (emphasis in original) (quoting *Desimone*, 924 A.2d at 943). Accordingly, the Court GRANTS the Board's motion to dismiss.

Moreover, as noted above in Section III-B, Plaintiff has abandoned three theories of demand futility. The Court denies leave to amend as to these abandoned theories of demand futility. *See Silingo*, 904 F.3d at 681 (affirming dismissal without leave to amend of abandoned claims). The Court grants leave to amend as to the theories of demand futility that Plaintiff has not

15

abandoned because granting Plaintiff an opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice the Board, and Plaintiff has not acted in bad faith. *See Leadsinger*, 512 F.3d at 532.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Board's motion to dismiss with leave to amend as to the theories of demand futility that Plaintiff has not abandoned. Should Plaintiff choose to file an amended complaint, Plaintiff must do so within 30 days of this Order. Failure to do so, or failure to cure the deficiencies identified in this Order and in the Board's motion to dismiss, will result in dismissal of Plaintiff's deficient claims with prejudice. Plaintiff may not add new claims or parties without a stipulation or leave of the Court. If Plaintiff chooses to file an amended complaint, Plaintiff must also file a redlined copy comparing the amended complaint with the Complaint.

**IT IS SO ORDERED.**

Dated: July 1, 2021

_Lucy H. Koh_
LUCY H. KOH
United States District Judge